THE STATE EX REL. HALLAUER, Appellant, vs. GOSNELL, City Clerk, Respondent.

*January 17—February 3, 1903.*

*Municipal corporations: Statutes: Construction: Common council: Board of public works: Powers: Fixing water rates: Use of meters: Certiorari: Jurisdiction: Abuse of discretion.*

1. By ch. 162, Laws of 1887, amending the charter of the city of La Crosse, there was established a new department of the city government, known as the "board of public works." Such board was thereby given power, subject to approval by the common council, to make by-laws, rules and regulations in relation to the waterworks of the city, and therein to fix uniform water rates to be paid for use of water furnished by such waterworks. Such powers had theretofore been conferred by the charter on the common council, but by the amendment the authority of the common council "to establish water rates to be paid by persons using the water" was eliminated. The amendment further provided that the common council should have power "by ordinance to make and enforce all needful regulations for ascertaining the amounts to be paid as water rates by persons using the water." *Held,* that the dropping from the enumerated powers of the common council the unlimited power to fix water rates, and transferring unlimited authority in the matter to the board of public works, its action not to have the force of law until approved by the common council, made that method of dealing with that subject exclusive, and the common council was empowered to fix water rates only by acting upon the recommendation of the board of public works.

2. Where a city charter authorizes the common council, by ordinance, to make and enforce all needful regulations for ascertaining the amounts to be paid as water rates by persons using the water, and necessary and expedient to protect such waterworks and the use thereof, and the whole scheme of the charter provision is, that the consumer shall bear all the expense necessary to enable him to take water from the public supply in the water mains, a requirement contained in an ordinance, adopted by the common council, that the consumers, in certain cases, at their own expense provide and use meters, and keep them in repair, is legitimate.

3. In such case, the provisions of the ordinance requiring consumers using service pipes above a certain diameter to furnish

meters, and leaving it optional with consumers using service pipes below that diameter, is not, as a matter of law, an unreasonable classification.

4. A suitor has no absolute right to the common-law writ of *certiorari*. Where the relator shows no equity, and, so far as his legal rights are concerned, has suffered no injury not remediable at law, it is proper to deny the use of the writ; and, where it further appears that the relator, as a private individual with a trifling injury, remediable by ordinary means, complains against the acts of a municipal corporation, it is an abuse of discretion to permit the use of the remedy of *certiorari*.

5. A city council, having authority by ordinance to fix water rates only by acting upon the recommendation of the board of public works of the city, established such rates without previous recommendation of the board of public works. It did not appear that the rates fixed by the council were inequitable. The pecuniary injury to the consumer was trifling, as compared with the disturbance of public affairs in compelling the city to defend its jurisdiction before the courts upon a common-law writ of *certiorari*. *Held*, that it was an abuse of judicial discretion to allow the writ on the relation of a consumer.

APPEAL from a judgment of the circuit court for La Crosse county: J. J. FRUIT, Circuit Judge. *Reversed*.

The city of La Crosse owns and operates a system of waterworks for the purpose of supplying water within the municipality for public and private use. Its charter, prior to 1887, vested power in the common council, by subd. 11, sec. 3, subch. IV, ch. 135, Laws of 1876, as amended by sec. 6, ch. 183, Laws of 1881:

"To provide for the erection of waterworks for the supply of water to the inhabitants of the city; to lay down water pipes; to establish water rates to be paid by persons using the water therefrom, and to prevent unnecessary waste of the water by any person or persons; to pass from time to time such ordinances as may be deemed necessary or expedient for the construction, regulation or protection of such waterworks and pipes and to enforce the same by suitable penalties."

That was amended in 1887 by ch. 162 of the laws of that year, the words "to establish water rates to be paid by persons

using the water therefrom" being eliminated. The charter was at the same time and by the same law further amended by establishing a new department of city government of an executive character, to be known as the "Board of Public Works," and to consist of members elected by the people. At the same time and by the same law the charter was further amended, adding thereto a new subchapter, numbered IX, on the subject of waterworks, in which the maintenance and everything in relation to the operation of the waterworks, so as to effect the purposes thereof, was placed under the immediate charge of the board of public works, but subject to the direction of the common council. By sec. 1 of that subchapter it was provided as follows:

"The board of public works, subject to the direction of the common council, shall assume and have exclusive charge and superintendence of the waterworks of said city, and of all property, records, contracts, transactions, reports, accounts, surveys, maps, plats, estimates, profiles, plans and documents of whatsoever nature pertaining thereto, and it shall thereafter be the duty of such board of public works to examine and consider all matters relative to supplying the city of La Crosse with a sufficient quantity of pure and wholesome water for the use of its inhabitants."

By sec. 7 the waterworks, and all the grounds, buildings, fixtures, machinery and other things appertaining thereto were declared to be under the control of the said board, with power to regulate and control and have general supervision of the same subject to the authority of said common council. By sec. 8 the board was given power to establish water rates, the following language being used:

"The said board shall have power from time to time to make and enforce by-laws, rules and regulations in relation to the said waterworks, and before the actual introduction of water they shall make by-laws, rules and regulations fixing uniform water rates to be paid for use of water furnished by the said waterworks, and fixing the manner of distributing and supplying the water for use or consumption, and for

withholding or shutting off the same for cause, and they shall have power, from time to time, to alter, modify or repeal such by-laws, rules and regulations now in force: provided, however, that no such by-law, rule or regulation, and no alteration, modification or repeal thereof, shall have any force until submitted to and approved by the said common council."

Sec. 9 gave the common council power as follows:

"The common council shall have power by ordinance to make and enforce all needful regulations for ascertaining the amounts to be paid as water rates by persons or corporations using the water, keeping accounts thereof, and giving the notices required by this act and by ordinances. It may provide for the payment of such water rates directly to the city treasurer, or for their collection by some subordinate of the board of public works, or a collector of water rates, to be appointed by said board of public works, and may require such subordinate or officer to give bond in such sum and with such sureties as it may prescribe."

By sec. 12 further power was given to the common council in these words:

"It shall be the duty of the said common council, and they are hereby empowered from time to time to pass such ordinances as may be deemed necessary or expedient to protect said waterworks and the use thereof, and to enforce the by-laws, rules and regulations of the said board of public works," etc., and to enforce all such rules and regulations by appropriate penalties.

Under the scheme of the charter service pipes, curb stops and all appliances for use of the consumer in taking water from the water main are required to be paid for by him.

March 8, 1901, the common council passed an ordinance containing provisions to the following effect: (1) A complete system of rates, arranged on the usual basis where water is not measured and also where it is measured by means of a water meter. Each consumer, by this system, was given the privilege of paying for water by the meter rate upon condition of his putting a meter in at his own expense and keep-

ing the same in repair, and not using water for his premises otherwise than through the meter, except those using water through a service pipe larger than three-fourths of an inch in diameter, who were required to supply their premises with meters at their own expense. (2) A scheme in detail for the collection of water rents and a prohibition against any change of water rates except under certain conditions, not recognizing any authority of the board of public works in the matter. (3) Regulations of the enjoyment of the water service, to prevent misuse thereof, such as the care and management of seals on standpipes and automatic sprinklers, conditions upon which water service might be re-established after being interrupted pursuant to the ordinances of the city or rules of the board of public works. (4) Penalties for wrongful interference with hydrants or stop cocks, or improper use of water contrary to such ordinance or rules. (5) Rules relating to the care of fire hydrants. (6) A declaration of authority to make other rules relating to water rates and collection of the same. Penalties for the violation of ordinances relative to the waterworks. A requirement regarding the management by consumers of their service appliances in case of an alarm of fire and during the continuance of a fire. A general repeal of all ordinances or parts of ordinances conflicting with the new enactment.

The ordinance was carried to the circuit court for La Crosse county for review, and was affirmed. The relator appealed.

For the appellant there was a brief by *McConnell & Schweizer,* and oral argument by *J. E. McConnell.*

*W. F. Wolfe,* for the respondent.

MARSHALL, J. Jurisdiction of the common council to pass the ordinance is challenged upon two grounds: First, because authority independently of the board of public works to fix rates was taken away from the common council by

ch. 162, Laws of 1887; second, because the charter does not grant authority to require consumers of water to measure the same through meters provided at their own expense.

We cannot escape the conclusion that the purpose of dropping out of the enumerated powers of the common council unlimited power to fix water rates and transferring initiatory authority in the matter to the board of public works, its action not to have the force of law till approved by the common council, was to make that method of dealing with the subject exclusive. Indeed, it does not seem that the legislative idea in the change is open to reasonable controversy. It is as plainly set forth as if a special law on the subject had been passed, giving to the board of public works power to fix the water rates, subject to the approval of the common council, and expressly repealing the existing law lodging such power absolutely in the council. The argument that, since the action of the board of public works is without force until approved by the lawmaking power of the city, its common council, inferentially such council has authority to take the initiative in the matter and legislate regardless of the board, is contrary to the settled doctrine that where the charter of a city provides the manner in which the will of the people shall be exercised, resort to any other method is usurpation. *Saxton v. Beach,* 50 Mo. 488; *Irvin v. Devors,* 65 Mo. 625.

It is said that the fixing of water rates is the exercise of legislative power and that the charter expressly makes the board of public works a mere executive body. Whether the fixing of water rates is so distinctly the exercise of legislative power as not to fall, in any reasonable view of it, within the scope of executive authority, and whether, if it is the exercise of legislative authority, it can be granted to a body of city officers elected by the people other than the city council, are questions not necessary to be considered. Granting all that is claimed on that branch of the case, so far as the principle thereof is concerned, it does not help respondent so far as we

can see, because the power of the board of public works to fix rates amounts to no more than authority to recommend by the adoption of a by-law embodying the judgment of the board, leaving the question of whether such recommendation shall have the force of law to the judgment of the common council in the exercise of its legislative authority. It cannot be doubted that the legislature may prescribe the conditions upon which a common council may legislate upon any matter, where all legislative authority is vested in it, and may limit the scope of its action. Taking the view most favorable to respondent, that is all that seems to be embodied in the charter under consideration. In effect, the common council is empowered to fix water rates only by acting upon the recommendation of the board of public works.

The provision in the ordinance permitting certain consumers to have meters at their own expense and requiring those using a service pipe larger than three-fourths of an inch in diameter to use meters, seems to be within the express powers given to the common council under the charter. As indicated in the statement of facts, in the general enumeration of the powers of the council, it is authorized to legislate by adopting such means as it may deem expedient to prevent waste of water and to protect and regulate the waterworks, and to enforce such legislation by suitable penalties. In the chapter devoted expressly to the subject of waterworks, by sec. 9 the council is empowered to legislate as to means for ascertaining amounts to be paid as water rates by consumers; and by sec. 12 it is empowered to legislate in its discretion for the *"protection of the works and the use thereof,"* and to enforce any and all of such legislation by suitable penalties. We do not doubt that under either the provision for the prevention of waste or the provision to make regulations for ascertaining the amount to be paid by consumers of water, the requirement contained in the ordinance for consumers, in certain cases, to use meters, and to provide

and keep them in repair at their own expense, is legitimate. It is a matter of common knowledge that the use of meters has a double purpose, and that the dominant one, as regards the party furnishing the opportunity to take water, is to prevent useless consumption thereof. Secondarily to that, and more for the benefit of the consumer than the party responsible for keeping up an adequate supply of water under proper pressure, is the measurement of the water. The consumer is burdened with the expense of providing a meter and keeping it in repair, but has the countervailing advantage, by the exercise of prudence in the use of the water, of paying only for the amount actually taken from the public supply, which, in most cases, by reasonable attention, can be made much less than what he would be required to pay by the schedule of rates where meters are not used.

The idea advanced by appellant's counsel, perhaps having some support in the authorities called to our attention, that a meter is a mere convenience solely for the party furnishing the water, is very wide of the mark. With as much propriety it might be said that the service pipe, curb-stop, or use of self-closing faucets and other appliances that might be mentioned, are mere conveniences for the party furnishing the water. They are necessaries, required as a condition of the consumer's taking water from the public supply, made so by such legislative authority as is contained in the charter before us,—that to prevent waste of water, to protect the use of the water service, and to prescribe the methods of determining the amount to be charged for water. The whole scheme of the charter is that the consumer shall bear all of the expense necessary to enable him to take water from the public supply. The service pipe, laid in the street from its connection with the water main to the curb stop, under the scheme of the charter, is required to be put in by the consumer or the owner of the property to be served.

We are unable to discover anything in the cases cited to our attention by appellant's counsel, when properly understood, seriously conflicting with the views above expressed. The question involved in *Red Star S. S. Co. v. Jersey City,* 45 N. J. Law, 246, was this: Can a city, under a system which contemplates that it shall pay all the expenses of procuring and distributing water to consumers, provide a water meter, locate it on property to be served, and compel a subsequent occupant of the property as lessee to pay for the meter as a condition of enjoying the water service? In deciding that question language was used upon which appellant's counsel rely, somewhat out of harmony with the conclusions here reached. We will not refer thereto at length. Much of it, if warranted at all by the facts of the case, is because of the peculiarities of the charter under consideration not found in that before us. It has this glaring infirmity: It refers to a water meter as a mere contrivance simply for use in distributing water so as to regulate quantity to price,—a contrivance merely for the convenience of the party furnishing the water. The fallacy of that is clearly shown in a case to which we will presently refer. If true in any view of the matter, it is only so as to large consumers. As to the great mass of them it certainly is not. In general, as we have said, the primary purpose of using water meters is to prevent the unnecessary use of water. Many consumers habitually abuse the privilege to take water. They may do it in a way extremely difficult to detect, and to greatly impair the efficiency of the water service for many purposes, fire protection and operation of motors being significant among them. Meters are used to guard against the danger of carelessness in leaving faucets and hydrants open when there is no necessity therefor. That idea was in mind in drafting the ordinance before us, as indicated by the provision that the use of meters by consumers using large service pipes was not left optional with them, while the use of meters on smaller pipes was so

left. The danger of unduly and unnecessarily reducing water pressure by open hydrants and faucets, especially on large service pipes, was deemed so great that meters were required, it being supposed, naturally, that as a rule open faucets or hydrants would not be allowed under a meter system when water was not needed. We apprehend that if the charter which the New Jersey court had under consideration had plainly indicated that consumers were expected to take water from the main supply pipe at their own expense and under such regulations and conditions as the city council might in its discretion see fit to adopt, broad powers being given to prevent waste, to preserve the use of the water system, and to make and enforce needful regulations for the ascertainment of the amount which consumers of water should pay for the privilege of drawing water from the water main, some expressions found in the opinion would not have been made.

In *Spring Valley Waterworks v. San Francisco,* 82 Cal. 286, 22 Pac. 910, 1046, another case referred to by counsel, the question decided was this: Is a requirement in an ordinance that the party furnishing water shall be at the expense of the meter to measure the water, and shall charge only for water actually used as indicated by the meter, a reasonable regulation, there being nothing in the organic law of the water company inconsistent therewith? Whether a requirement that consumers shall furnish meters at their own expense as a condition of enjoying the water service, under charter regulations such as govern the case before us, was not involved. The language of the opinion, "The expense of water meters could not be imposed upon the consumer," must be taken with reference to what was under discussion in the case. True, *Red Star S. S. Co. v. Jersey City,* 45 N. J. Law, 246, was cited, but we do not see that it has anything to do with the point under discussion. In any event, the delegated power exercised in passing the ordinance there under discussion was dissimilar in many material particulars to

that involved in this case. The question was whether the company might be compelled to bear the burden of putting in meters, not whether consumers might be compelled to bear such burden.

We find the general subject of whether a consumer of water can be required to measure what he takes from the public supply through a meter provided at his own expense, the corporation being authorized to charge meter rates, and its system contemplating mere permission to consumers to take water from its water mains, as in this case, was discussed at considerable length in *Sheffield Waterworks Co. v. Bingham,* L. R. 25 Ch. Div. 443. The conclusion reached was that it was competent for a water company, under the circumstances suggested, to impose upon the consumer the burden of providing at his own expense his water meter. The reasoning leading to such conclusion may well be adopted here. We quote from the opinion:

"The company are bound to put mains down in the streets. They are bound to keep those mains charged with water at high pressure, and having done that every householder in Sheffield is free either to make use of the water in that main or to decline to make use of it as he pleases. If he desires to make use of it, he himself makes the communications between his own house and the main, subject, of course, to all proper provisions for taking care that he does no injury to the waterworks company in making the connection; and subject also to this, that the connections must be properly made, so as not to abstract more water than he is entitled to take, and not to do any injury of any sort or description to the waterworks company."

The court, by Justice PEARSON, further reviewing the position taken,—that the water company, not the consumer, should furnish the meter; that if it charged meter rates it should measure the water at its own expense the same as a merchant in selling tea to his customer weighs the same out of his stock,—said, in substance: The argument is falla-

cious because, strictly speaking, the company does not furnish the water as a merchant furnishes tea. It provides a supply of water under pressure under such conditions that the consumer can, under its regulations, if he sees fit, connect an appliance of his own therewith and take water therefrom. In other words, the company furnishes the opportunity outside of the consumer's property line, at its water main, for him to supply himself with water. He takes it. He is granted the right to take it under certain conditions. The company, from the necessities of the situation, cannot know when he takes it. He is the only person in a position to measure the water, since he takes it whenever he likes and in whatever quantities he likes, under such conditions as may be prescribed to prevent his conduct from interfering with others enjoying the same opportunity. The company is entitled to have the measurement of what he takes made by him and in such a way that it will be reasonably protected from false measurements or reports. By the automatic method involving the use of the meter, that is accomplished. The consumer measures the water by the act of taking it, and informs the company of the result by exhibiting to it the register, which it can see only by his permission to come upon his premises for that purpose. The burden of the expense thereof is legitimately cast upon the consumer as a condition of his enjoying the privilege of taking water from the source of supply at his disposal.

A contrary view is favored in an article found in 27 Am. Law Reg. (N. S.) 277–283, reference being there made to *Sheffield Waterworks Co. v. Carter,* L. R. 8 Q. B. Div. 632, which is not entirely without warrant, there being some language used in the opinion in that case and in the syllabus thereto inconsistent with what was decided in the later case. But Justice PEARSON, in writing the later opinion, reviewed at length and critically analyzed all that was said on the subject in the former case, and concluded that it did not decide

the point which was the precise one at issue in the case before him. He said:

"I can only say, having given a good deal of attention to this case, that I believe the learned judges who decided that case would all think I was erring very greatly indeed, and charging them with something they never intended to do, if I were to come to the conclusion that they had any notion of deciding the question which is before me to-day."

A point is made that the meter requirement in the ordinance fatally discriminates against consumers using large service pipes, in that it imposes upon them the burden of procuring a meter, while it leaves the matter of using a meter by others optional. We are unable to say that as a matter of law the classification of consumers thus made is unreasonable. The power vested in the council to protect the use of the waterworks is discretionary in character and conferred in broad general terms. It would require a very plain case of abuse of power in not giving equal opportunities to all to take water under like conditions and circumstances, to warrant the court in interfering in such a case as that presented by the ordinance in question. We can see a good reason why there are dangers to be guarded against where water is taken from a water main through a large service pipe, which, if they exist at all, do not to the same extent where a small service pipe is used. The different conditions may and probably do justify the classification made in the ordinance.

From what has been said, that part of the ordinance under consideration relating to meters, and everything in it except the matter of fixing rates, were proper subjects for legislation by the common council independently of the board of public works. The requirement for meters being valid, a schedule of rates to be applied to meter measurements was necessary. It was the duty of the board of public works to take the matter in hand and by a proper by-law submit its conclusion to the common council for approval. That such method of treat-

ing the matter was necessary to a legal establishment of the meter rates, we have no doubt. But, since there is nothing inequitable that we can see in the rates fixed by the ordinance, and it was the duty of the board to adopt a by-law on the subject, and in the end no rates could have been established not approved by the common council,—no other rates than the ones which the council adopted unless they consented,—there is nothing in the ordinance inflicting any real injury upon the relator. At most there is a fatal irregularity from a legal standpoint, in doing that which might have been done legally by observing strictly the charter method. From the standpoint of equity, that occupied by the court in granting or denying the use of a discretionary writ, relator is not injured at all by the ordinance complained of. As regards any pecuniary injury that could in any event have been inflicted upon him, it is believed that it would be trifling as compared with the disturbance of public affairs which would result from allowing every individual member of a city community, upon every trifling pretext involving the validity of an ordinance, to force it to defend its jurisdiction before the courts upon a common-law writ of *certiorari*. After careful consideration of the matter we have concluded that it is an abuse of judicial discretion to allow the writ of *certiorari* in such a case as is here presented. The mischief that might result from a rule permitting every individual, not smarting under any substantial injury, nor any not remediable by ordinary methods, to make the court, in effect, a sort of upper house, to review all jurisdictional matters in municipal legislation, involving matters not of a really prejudicial character, is very great. The law is well settled that a suitor has no absolute right to a remedy by common-law writ of *certiorari*. When to permit and when to deny the use of it rests in the sound discretion of the court. Even on appeal to this court, after the lower court has allowed such use, it is proper, where its action seems plainly wrong, upon a reversal of the judg-

ment to remand the proceedings with directions to dismiss the writ. *Knapp v. Heller,* 32 Wis. 467; *State ex rel. Schintgen v. La Crosse,* 101 Wis. 208, 77 N. W. 167. The common rule is that where the relator shows no equity, and, so far as his legal rights go, no injury not remediable at law, it is proper to deny the use of the writ. It is considered that the cases cited voicing the doctrine of this court establish the rule to be also that, where there are these additional elements to those above mentioned,—a private individual upon the one side as relator, with a trifling injury, if any, to be redressed, and that remediable by ordinary means, and the public on the other,—it is an abuse of discretion to permit the use of the remedy.

The logical result of the foregoing is this: The trial court should have considered the use of the writ, under the circumstances of this case, as presenting a question of its own jurisdiction, and quashed the proceedings with or without a motion to that effect, as the circumstances required. Having proceeded to decide the matter presented on its merits, it should have sustained the jurisdiction of the common council only as to those portions of the ordinance that do not deal with the subject of fixing rates, and that only upon the ground that such portions are separable from the balance of the ordinance. It is considered that they are separable. As the matter stands now the judgment is erroneous, and it seems best that it should be reversed *in toto* and the cause remanded with directions to dismiss the writ.

*By the Court.*—So ordered.