State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

THE STATE EX REL. MILWAUKEE MEDICAL COLLEGE, Respondent, vs. CHITTENDEN and others, Appellants.

*February 3—March 20, 1906.*

CERTIORARI. (1, 3, 4) *Cause of action:* Quasi-*judicial tribunals: Discretion.* (3–7, 11) *Parties.* (3, 6–8, 11–13, 24) *Jurisdiction: Jurisdictional error.* (12, 13, 23, 24) *Use of writ: What may be reviewed.*

STATE BOARD OF DENTAL EXAMINERS. (8–10, 17, 27, 32, 36–38) *Licensing of dentists: Dental colleges: Adjudication as to status: Reputability: Evidence: Presumptions.* (14) *Character of authority of board.* (18) *Procedure: Due process of law.* (25, 27, 32, 33, 35–38) *Powers of board: Exercise: Making rules: Notice of contemplated action.*

CONSTITUTIONAL LAW. (15) *Judicial powers.* (16) *Legislative powers.* (19) *Due process of law.* (26) *Delegation of legislative powers.* (28–31) *Police regulations.*

ACTIONS. (1, 2) *Place of trial.* (17) *To determine status of persons.*

COURTS. (20–23) *Circuit courts: Appellate jurisdiction: Supervision of inferior courts and jurisdictions: Use of writ of* certiorari. (21) *Right of appeal.*

DEFINITIONS. (1) *"Action."* (2) *"State officer."* (5) *"Party."* (15) *"Judicial powers."* (16) *"Legislative powers:" "Legislative discretion:" "Administrative discretion."* (30) *"Reasonable,"* as applied to police power. (34, 38) *"Reputable,"* as used in law regulating the practice of dentistry.

Relator was accorded the *certiorari* remedy to vacate a sentence of nonreputability. There was a motion to change the venue to Dane county, under ch. 366, Laws of 1905, relating to actions against state officers. It was denied. Prior to May 27, 1903, ch. 56c, Stats. 1898, relating to dentistry, provided for a board of five members, appointed by the governor, a majority to

be from the Wisconsin State Dental Society. It was required, upon the faith of his diploma, to license to practice dentistry, any regular graduate of a reputable incorporated dental college requiring candidates for graduation to take two full courses of lectures, of five months each. Said chapter, by ch. 411, Laws of 1903, was changed, making the mandatory feature as to issuing licenses discretionary, giving the Dental Society power to nominate a majority of the board, and fixing as the requisites for an efficient diploma, reputability of the college in the judgment of the board, preliminary education of matriculants enough for entrance to the junior class of an accredited high school, and four courses of lectures of at least seven months each, in separate years. It remained silent as to the board's controlling examinations for matriculation. Prior to March 1, 1902, a custom existed permitting matriculants to make up entrance deficiencies the first year. Prior to the occurrences material here, the board ruled thus: entrance qualifications shall be equal to those required for entrance to the junior year of a high school; examinations shall be conducted by the superintendent of public instruction, or his appointee; three full courses of not less than seven months each, in separate years, shall be required for graduation, as to students matriculating prior to the session of 1903–1904, and one additional course commencing with such session; colleges shall not charge students less than one hundred dollars per term nor rebate advertised fees; no student shall be received or retained, deficient in entrance qualifications, and compliance with such rules shall be a condition of reputability. The change as to entrance qualifications was unknown to relator till it became morally bound to accept students for 1902–1903 as before. Six so accepted were made freshmen and academic students as well. They made up the deficiencies during the year. June 15 to June 20, 1903, inclusive, the board considered conduct of relator as aforesaid, also as to rebates and other alleged transgressions, resulting in its being adjudged reputable, though censured on the second point and admonished against further transgressing. Thereafter it was mooted as to whether the students should have credit for the year partly spent in preparation. The board ruled negatively. Nevertheless the students were otherwise registered. Before graduation day, according to such registration, relator indicated willingness to comply with the board's will to save condemnation. An action was then commenced against it by a student to test the matter, the board being given opportunity to defend, which it declined. The decision was against the relator. The board formally and without notice condemned it as not reputable, upon failing to

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

obtain a more definite answer, as to whether it purposed obeying the court without further contest, than that it did unless notified by the board not to do so and that otherwise it would be deemed not reputable. Such decision was reversed for judicial error.

### Controlling Principles.

1. An independent proceeding commenced by an original writ, such as *certiorari, mandamus*, and the like, is an action under sec. 2595, Stats. 1898.
2. The ordinary meaning of "state officer" is head of a state department, such as governor, secretary of state, and the like. It should be thus restricted when used without circumstances indicating any other intent.
3. Where a decision by a *quasi*-judicial tribunal affects injuriously and with substantial directness one not a party to the record having no other efficient legal remedy, he may, in the discretion of the court possessed of the jurisdiction, have the use of its writ of *certiorari* to remedy the wrong as to jurisdictional errors.
4. If in the exercise of sound judicial discretion an injured person ought to be accorded an original writ of *certiorari*, it is an abuse of authority to refuse it.
5. The rule that no one but a party is entitled to use the remedy of *certiorari* is to be regarded as using the term "party" in its broad sense: that of including all persons injuriously affected with substantial directness and having no other efficient legal remedy, whether they are parties to the record or might properly be such.
6. When the writ of *certiorari* is granted to one neither a party to the record nor necessary thereto,—the tribunal in the proceeding sought to be reviewed having jurisdiction of the party or parties and of the subject matter,—such writ reaches only jurisdictional errors committed in deciding a matter within its jurisdiction to decide, proceeding properly.
7. When the proceeding to be reviewed was direct against person or property, the personal right being the only one involved or being one coupled with another primary right, he is a necessary party and, if not brought in by proper citation, a writ of *certiorari* in his behalf will reach jurisdictional error as to proceeding at all in the matter and excess of jurisdiction as well.
8. A decision as to the status of a dental college, incidental to passing upon an application for a license to practice dentistry, based on a diploma issued thereby, is within the rule stated as regards discretionary authority to permit the use of the writ of *certiorari* to correct jurisdictional errors.

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

9. It is proper, in administering the law regulating the practice of dentistry, for the official board, of its own motion, or on petition of a college of which it has jurisdiction, to adjudicate its status as regards reputability.

10. The adjudicated status of a college is presumed to continue till the presumption shall have been reasonably rebutted, under the general rule that "when the existence of a person, a personal relation, or a state of things is once established by proof, the law presumes that the person, relation, or state of things continues to exist as before, until the contrary is shown, or until a different presumption is raised, from the nature of the subject in question."

11. If the status of a dental college is adjudicated in an action *in rem*, whether the proceeding is solely against the *res* or one to pass upon an application for a license and against the *res* as well, such college may properly be accorded the *certiorari* remedy to test the decision for jurisdictional error, either as to the subject matter or excess of jurisdiction.

12. The writ of *certiorari* is not usable as a means of reviewing legislative discretion, or judicial discretion, or a determination which is strictly a usurpation in that it was pronounced by one having no authority or semblance of authority.

13. The writ of *certiorari* on behalf of a proper applicant is a proper means of testing, for jurisdictional error, the decision of a *quasi*-judicial tribunal having authority, under some circumstances, to deal with the subject involved, or of a tribunal of such dignity that its action in the matter might probably be injurious to such applicant if allowed to stand unchallenged.

14. The authority of the board, under the law regulating dentistry, to pass upon the reputability of colleges, is neither legislative nor judicial but is *quasi*-judicial: that species of authority commonly intrusted to individuals, boards, or commissions to determine matters of fact when that is essential to the performance of administrative duties.

15. The judicial authority of the constitution is power to administer remedies for remedial rights, formerly exercisable exclusively by courts: to make judicial decisions, strictly so called, in actions or special proceedings and to enforce the same.

16. Authority which, by the constitution, is vested in the legislature, is the power to make law. It may be exercised, leaving in the particular instance to some other agency the duty of determining questions of fact essential to the application thereof. The former involves legislative, the latter administrative discretion.

17. When the condition of a person, the thing denominated status, is a matter of public concern, it is a proper object to be dealt

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

with and settled by a direct proceeding in any tribunal having jurisdiction of the *res,* and that applies to the status of a college under the system of legislative regulation of the profession of dentistry.

18. Where the subject matter involved in a judicial or *quasi*-judicial proceeding is the intangible thing denominated status, the proceedings in respect thereto requisite to a legitimate determination are the same as in a case where the subject matter is of a tangible character.

19. In any such case the rule applies that no one shall be condemned in his person or his property without first having had his day in court according to the law of the land: the fundamental principles of justice.

20. The constitutional grant of appellate jurisdiction given to circuit courts does not include authority to review the proceedings of an inferior tribunal on the merits by the use of a writ of *certiorari.* The use thereof, to commence an action, relates to judicial authority to supervise inferior courts and jurisdictions.

21. The appellate jurisdiction of the constitution is one thing, the right of appeal is another. The latter is a creature of the legislature and does not exist where the legislature has not acted.

22. The power of superintending control given to circuit courts is limited by means afforded for its exercise: the functions of the original writs referred to in connection with the grant, all of which appertain to matters of jurisdiction.

23. The writ of *certiorari* was, by the constitution, made an appurtenance, as before, to the jurisdiction of superintending control, with its common-law function in that regard and that only. Such function extends wholly to matters of jurisdiction, as regards independent proceedings.

24. Jurisdictional error, as to a court proceeding according to the course of the common law, relates to the person or the subject matter. Such error as to other tribunals extends to clear errors of law, such as deciding an issue of fact one way when the reasonable inferences from the evidence so strongly point the other way as to leave no reasonable basis for the decision.

25. The law governing the board of dental examiners does not confer thereon power to do more than to execute the legislative will along lines expressed by it with reasonable definiteness. The mere making of reasonable rules to be followed in performing administrative duties, is not the exercise of legislative authority.

26. The true distinction between delegation of power to make law and delegation of power to administer law is this: the former

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

contemplates exercise of discretion as to what the law shall be, the other exercise of discretion in the administration of law.

27. The implied grant of authority to the dental board to determine the status of a dental college, no reference being made to the subject of notice thereto and opportunity to be heard, does not suggest power to proceed in that regard without such notice: on the contrary, it implies action in accordance with the fundamental principles of justice.

28. The legislature may properly designate any agency it sees fit within the state, reasonably calculated to act justly in the matter, to nominate persons for appointment to administer its mere police regulations.

29. The police power includes legislative authority to make all regulations reasonably necessary or conducive to the public welfare.

30. The word "reasonable" limits the police power, both as to subjects to be regulated and the character of the regulation, by express constitutional inhibitions and implied ones as well, and the judgment of the judiciary as to what is within the realm of such subjects and reasonable, fair doubts in all cases being deemed sufficient to turn the scales in favor of legislative authority whenever it shall have been asserted.

31. There is no such thing as a police power which is above the constitution, or which justifies reasonable or any violation of express constitutional prohibitions or manifest implied ones; the power is hedged about on all sides by constitutional restraints with the judiciary to stand guard at the boundaries.

32. The feature of the dental law prescribing conditions upon which a diploma from a dental college may be received as sufficient evidence of qualifications to permit of a license to practice dentistry being issued to the holder thereof without examination as to his fitness, does not deny or prejudice the right to study for such profession.

33. The dental board, in passing upon a question within its jurisdiction to solve by the exercise of judgment, is supreme, so long as it proceeds to a reasonable conclusion upon evidence bearing on such question.

34. The meaning of the word "reputable" as used in the law regulating the practice of dentistry is "worthy of good repute;" it relates to real character, not to mere reputation in that regard. (On this MARSHALL, J., dissents.)

35. The power conferred upon the dental board relates to reasonable administration of matters appertaining to the public welfare, not to interferences with the internal management of dental colleges.

36. The law for the regulation of the practice of dentistry does not

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

authorize the official board to invade the private affairs of a dental college in respect to its rate of tuition or whether it shall grant concessions from advertised rates or by taking charge, *in invitum*, of its examinations as to entrance qualifications.

37. A statutory requirement as to educational qualifications for entrance upon a course of study at a dental college as a condition of the diploma eventually awarded being *prima facie* sufficient to prove qualifications for the practice of dentistry, unaccompanied by a prohibition of the common practice of allowing students to make up, in some reasonable degree, deficiencies in preliminary education during the first year after matriculation, must be presumed to contemplate such practice and the continuance thereof.

38. Reputability, as the term is used in the dental law, relates to that which will enable the college to do good work and the actual accomplishment thereof; it is separate and distinct from other requisites as to a diploma being a passport to the favor of the official board as regards the issuance of a license. It may or may not exist, and all the other requisites be present.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Milwaukee county: ORREN T. WILLIAMS, Circuit Judge. *Affirmed.*

*Certiorari* to the State Board of Dental Examiners. This is the substance of the recitals in the writ: The relator is a domestic corporation organized in 1893, having a paid-up capital of $150,000, and authorized to conduct a college for teaching, among other things, dentistry. It has property in its business of the value of $175,000, and a good will of great value. It has at all times conducted a first class reputable dental college. It has graduated therefrom 312 persons, including twenty-seven of the class of 1905, all being worthy professional men. It belongs to the National Association of Dental Faculties, an organization extending throughout the United States for the purpose of improving the art of dentistry and maintaining suitable educational requirements. It is on a plane in all respects, having regard for age and investment, with the great dental colleges of the world. It is,

## ERRATUM.

127 Wis. 474, line 16 from bottom. For ORREN T. WILLIAMS, Circuit Judge, read WARREN D. TARRANT, Circuit Judge.

in fact reputable and was so regarded by such board up to about the time for it to deal with relator's class of 1905. The college is so regarded by said association and by the National Association of Dental Examiners, composed of official boards throughout the United States, including that of Wisconsin. June 26, 1905, said State Board—without evidence, or notice to the relator or knowledge that any such thing was impending, or of any investigation, upon an application for a license—in secret and executive session, promulgated a resolution in these words:

"*Resolved,* That in the judgment of the Wisconsin State Board of Dental Examiners the *Milwaukee Medical College,* Dental Department, is not a reputable dental school."

That was done to injure relator, not as a result of judgment by the board on evidence produced before or accumulated by it, and entered of record as a basis therefor. No change in the status of relator occurred between the time said board dealt with the former's class of 1903, treating the college as reputable, and the passage of said resolution. Said board, since such condemnation, has adhered thereto and declared its intention to so continue and refuse recognition to relator's graduates as possessing diplomas from a reputable institution. By reason thereof relator cannot proceed with its ordinary business or suspend the same without serious loss. All diplomas issued by it not yet passed upon by the board are by the latter's aforesaid action rendered invalid as regards a basis for the practice of dentistry in this state, to the relator's great financial detriment, without due process of law and contrary to the fourteenth amendment to the national constitution. Such board grounds its action on supposed authority conferred upon it by ch. 411, Laws of 1903, which contravenes such amendment and also various provisions of the state constitution upon which relator relies.

Before return was made to the writ the appellants moved

the court for a change of venue to Dane county under ch. 366, Laws of 1905, which was denied, and the ruling was duly excepted to.

In due course a return was made, which, as to matters material here, is about like this: In all proceedings mentioned in the writ the board acted pursuant to ch. 56c, Stats. 1898, and ch. 411, Laws of 1903. The record of the meeting at which the resolution complained of was adopted, is in these words:

"Milwaukee, Wis., June 26, 1905.

"Hotel Pfister. Executive meeting of the Wisconsin State Board of Dental Examiners: Drs. C. C. Chittenden, F. A. Tate, C. S. McIndoe, J. J. Wright present.

"The following resolution was presented and adopted:

"*Resolved,* that in the judgment of the Wisconsin State Board of Dental Examiners, the *Milwaukee Medical College,* Dental Department, is not a reputable dental school.

"Motion was made and seconded that we reconsider the action taken on the above resolution to gain further information on the subject."

The circumstances leading up to such action are these: March 1, 1902, the board in session provided, among other things:

"Sec. 1. The minimum qualifications for the session beginning 1900–1901 shall be equivalent to those for entrance into the second year of a high school. Such minimum beginning with the season of 1902–1903 shall be the qualifications for the third year of a high school. All matters appertaining thereto shall be determined by the state superintendent of public instruction, or his special appointee, whose decision shall be final, subject to the board's approval. All certificates of educational qualifications before being accepted shall be verified by correspondence with the authority issuing the certificate.

"Sec. 2. Attendance of students upon three full courses of not less than seven calendar months during each and separate calendar years should be required before final examination for graduation. Attendance upon four full courses of not less

than seven months each, in separate academic years, should be required before examination for graduation for all students matriculating after the session of 1902–1903."

As early as September 13, 1902, the relator was informed that strict compliance with the rules of the board would be required. They are identical with the rules adopted by each of the two associations mentioned in the writ, each making strict compliance therewith a criterion of reputability. There were in force during the time covered by the occurrences leading up to the action complained of, these other rules:

"Sec. 23. Colleges must maintain their fees for tuition as published in their announcements, and where a college has increased its fees for tuition no students shall be received at the former fee. There shall be no evasion of this rule by giving to any student, in lieu of the full fee, any rebate, commission, concession, or privilege."

"Sec. 36. The minimum tuition fee for colleges recognized by this board shall be $100.00 per term, beginning with the session of 1902–1903, except as in case of sec. 37."

"Sec. 37. This board will, until further notice, grant to the extent of its judicial powers under the state laws, higher recognition to diplomas of such dental colleges as require credentials for matriculation equivalent to high school graduation and whose course of study is extended to four years of at least seven calendar months each for graduation."

October 4, 1902, a charge was laid before the board by a representative of the Wisconsin College of Physicians and Surgeons, located in Milwaukee, of the relator having violated said rule 23. October 6th, the board formally commenced an investigation thereof. During such investigation a representative of relator filed charges against said Wisconsin College as to its reputability. Whereupon it was determined to include that in the pending inquiry. Much evidence was taken regarding the first charge. October 7, 1902, the board convened to continue its labors. The relator appeared with its attorney and objected to the board's jurisdiction, which objection was overruled. The investigation as

to the first charge having been closed, subject to relator's right to produce evidence, it declined to offer any. The board evinced readiness to hear any such evidence as relator desired to offer in support of its charges. By its attorney, it declined to proceed. The board then adjourned without making any decision. Later the president of relator made charges against the official examiner appointed by the state superintendent of public instruction, as regards his fairness in the administration of his duty. January 27, 1903, at a meeting called for the purpose of considering such charges, relator having opportunity to be present, the charges against the Wisconsin College were withdrawn. The board then resolved that any future occurrence of one college filing charges against another and refusing to sustain them by evidence would not be regarded as reputable. The relator was notified thereof, and that the charges against the Wisconsin College had been dismissed.

There being no appearance by relator at the meeting to investigate its charges against the examiner, and he being present to meet any evidence that might be presented against him, his administration was approved.

June 3, 1903, relator requested the board to define the status of certain special students, as regards eligibility for the junior year and requesting that they might have that standing, contingent upon their showing proper entrance qualifications and performance of the work of the freshman year. The request was based on the facts, as claimed, that prior to the session of 1902–1903, the board permitted freshmen to make up entrance requirements the first year; that relying thereon, relator corresponded with those who thereafter became special students, and was not informed of any change until a few weeks before the opening of the regular term; that up to such time there was no definite plan as to the required scope of the examination and when the change came relator was not prepared therefor; that those who failed to pass had moral

claims upon the relator, which it had endeavored to discharge by making them special students in the freshmen class while they were entered as students in the academic department, which required them to spend in the latter three hours per week on algebra, rhetoric, and composition. That was followed by a communication, signed by authority of the board, to each of the members of relator's graduating class of 1903, who had a pending application, based upon his diploma, for a license, to the effect that the issuance of the license would be conditioned upon evidence being produced satisfactory to the board touching the reputability of the relator on these points: First. Did it secure, or seek to secure, students for 1902–1903 by offering to accept and retain them for less than advertised fees? Second. Did it attempt to evade the rules of the board as to requirements for admission by taking students who had failed to pass the educational test? Third. Had it by its officers attacked, intentionally, the fitness of the official examiner and his character as an honest public servant? Fourth. Was the dean of relator justified in failing and refusing to meet the board and confront its examiner with proof of the charge made by such dean after having agreed to do so? Each applicant for a license was at the same time notified of the date and place when the board would be in session to receive evidence upon such points. At such time and place the relator appeared by attorney, and the graduates likewise appeared. The former objected to any proceedings to inquire into the reputability of relator without formal notice to it, specifying the charges against it, if any, and its being made a party. The objection was overruled. A motion was then made for the issuance of licenses upon a previous decision of the board made September 15, 1902, declaring the college reputable. The board asserted jurisdiction to reconsider the matter because of evidence in its possession, and ruled that the burden of proof was upon the applicants. Their attorney maintained the contrary, but that in any event they had successfully car-

ried the burden by presenting the previous judgment until the board, or some one, presented evidence reasonably sufficient to supersede it. The board persisted, suggesting that the evidence upon which their position was based was of a public nature and open to inspection. The attorney for the graduates persisted, claiming that they were entitled to rely on such judgment until evidence was formally presented in their presence displacing it. Relator objected to a decision as to its reputability in advance of specific charges being filed and opportunity given to it to be heard. The session was continued to 2 p. m. June 15, 1903, at which time, by a vote of four to one, relator was declared to be reputable. At a subsequent meeting held the following 20th day of June it was in due form held that relator was guilty of violating rule 23, however that the transgression was not so serious as to warrant withholding licenses from the graduates of 1903, though relator was censurable in the matter. It was admonished that any further violation of the rules would not be tolerated.

October 9, 1903, the board interrogated the National Association of Dental Faculties as to what standing the students in relator's institution were entitled to for 1903–1904, who ranked as freshmen for 1902–1903 because of not having the requisite entrance qualifications but were permitted by the college to make up deficiencies during the year, suggesting that, as it understood the matter, such students were to be required to show the requisite qualifications to enter upon the study of dentistry, and spend three years more before graduation.

October 15, 1903, the special examiner passed favorably upon the qualifications of Oscar Hansen, Robert A. Burg, Ernest Redemon, and Fred E. Wrigglesworth, who failed at the examination in 1902.

After considerable correspondence between the president of the board and the authorities of the National Association of Dental Faculties, the determination of the latter was defi-

nitely made known, to the effect that students who were not up to the entrance qualifications for 1902–1903, according to the report of the official examiner, should be required to show requisite entrance qualifications before entering upon the session of 1903–1904, and take three years more of successful study before being permitted to graduate. The board was admonished that "these students are to take three years more." It adopted that decree as its own, and thereafter proceeded accordingly.

January 28, 1904, the relator was admonished of the importance of its taking note of the rule "that no dental college shall be recognized as reputable by this board in which students are accepted or allowed to continue in attendance, upon any conditions other than those required of regular matriculants, whose credentials have been duly approved by the accredited and acceptable special examiner appointed by the state superintendent of public instruction, and who have in all other respects complied with the requirements of the published 'Rules and Regulations' of this board 'regarding the general conduct and reputability of colleges desiring recognition of their diplomas.' "

February 6, 1905, inquiry was made of relator as to whether it proposed graduating with the class of 1905, students who were carried as irregulars, and freshmen as well, for 1902–1903, and whose names appeared in the catalogue for 1903–1904 as juniors. That related to the six students, Allen Schlafer, Fr. Wrigglesworth, Alb. Frederich, Rob. A. Burg, Oscar Hansen, and Ernest H. Redemon. An investigation disclosed that such students, though they failed to pass the entrance examination for the year 1902–1903, had nevertheless been catalogued as entitled to credit for the work of that year in the regular course and had actually been given such credit. The relator was thereupon informed that its conduct in that regard would not be recognized by the board.

May 17, 1905, one of the six students in due form com-

menced a *mandamus* action against relator to compel it to graduate him as one of its class of 1905 and to issue to him the usual diploma. There were recitals in the petition for the writ which were in substance or legal effect embodied in the latter, and may be stated thus: The college advertised for students to commence the study of dentistry at the commencement of the school year of 1902–1903, saying: The entrance qualifications will be the same or equivalent to those required for entrance to the third year of an accredited high school: the college subscribes to the rules governing the conduct of dental colleges in this state adopted by the Wisconsin State Board of Dental Examiners: deficiencies in entrance qualifications may be made up during the first year.

Induced by the representations thus made by the college to the general public, for the purpose of obtaining attendants in its dental department, the petitioner devoted time and money in acquiring the necessary qualifications to take up the study of dentistry at such college, and was pursuant to such representations duly matriculated in the dental department October 3, 1902, paying the regular fees which have not been returned. He continued his course of study for the full period of three years, paid all fees demanded or demandable by the college, complied with all its rules, and passed successfully all examinations required thereunder for graduation in the class of 1905. Nevertheless the college refuses to accord to him the customary diploma. No claim is made that he is not qualified in every respect to practice the profession of dentistry. The petitioner failed to pass the examination under the special examiner before commencing his course, but made up all deficiencies in 1902–1903 and then applied for a re-examination which was refused. Thereafter he passed the requisite examination for and obtained a third grade certificate to teach in the public schools of the state under the county superintendent of schools for Green Lake county. The requisite qualifications for obtaining such certificate are the equivalent of those re-

quired to enter upon the third year of a high school course. Such certificate was presented to the college and at its request was then presented to the official examiner, who refused to recognize the same. The college is a member of the National Association of Dental Faculties and during the period of petitioner's study at the college it conducted its affairs in strict harmony with the standard fixed by said association. During all such time it was customary at such college, and others of reputability, to permit entrance requirements to be made up the first year, if necessary. The State Board with full knowledge of such custom as to such particular college on several occasions recognized it as reputable, both before and after petitioner's matriculation.

The college made return to the alternative writ of *mandamus* admitting substantially all the aforesaid matters and submitting to the court as its only justification, substantially these facts: About the date of the petitioner's matriculation the college was notified by the State Board that the rule or custom permitting deficiencies in entrance qualifications to be made up the first year of the course had been abrogated. He was soon thereafter notified thereof, but insisted upon remaining and pursuing his studies according to the matriculation agreement. In March, 1905, the college was notified by such board that the petitioner could not receive credit for the year during which he was engaged, in part, in making up entrance qualifications. The college has refused petitioner the privilege of graduating, but based its action on the requirements of the State Board of Dental Examiners. The representations made in the catalogue of 1902–1903, upon which relator relied in matriculating at the institution and entering upon his course of study, were in harmony with the standard then existing of the National Association of Dental Faculties, and that of other reputable colleges.

The cause was submitted upon the writ and return and proper motions in respect thereto. Findings of facts were

made accordingly upon which the court decided as matter of law: First. The relator, in matriculating at the college for the school year of 1902–1903, in reliance upon the representations made by the institution, secured a contractual right to a diploma upon his complying with the conditions so brought to his notice. Second. The abrogation of the rule permitting entrance qualifications to be made up the first year of the college course, of which notice was not given to the college until, about October 4, 1902, and not brought to the notice of relator until after his matriculation, is not effective as to him. Third. He was wrongfully denied the privilege of graduating with the class of 1905.

The State Board after service of the writ and before return was made was notified of the action and given full opportunity to defend. On the 26th day of June, 1905, there was placed before it a copy of the decision in the action but it did not know then of the issuance of the peremptory writ. Thereupon it adopted, substantially without consideration, the resolution condemning the college as disreputable, in the form heretofore quoted, but before adjournment reconsidered its action and postponed the matter "to gain further information on the subject." The next day it made inquiry of the college as to whether it intended to graduate the six students with the class of 1905. There were then pending several applications for licenses by members of such class, based solely on their diplomas. The relator replied to the inquiry aforesaid that it had defended the *mandamus* action in good faith, doing all the law permitted; that diplomas had not been granted to the six students and none would be, unless the college was forced to do so, and that at all points the board was privileged to appear and defend the position of the college. Thereupon the board made inquiry as to what steps, if any, the college intended to take to avoid giving a diploma notwithstanding the court's decision. The college replied, calling attention to the fact that the board had been conditioned at all times to aid the

former in defending the latter's rules and stated that the col-
lege would be obliged to defer to the judgment, unless the
board ordered it in writing not to issue the diploma, or gave
it notice in writing that in the event of such issuance it would
declare the college not reputable, in which case it would not
issue the diploma.   Much anxiety over the situation was ex-
pressed and the board was requested to make answer to the
letter on that day.   The board made no answer to the com
munication until after the occurrence of the next day.   On
such day the fact was brought to the attention of the board
that the peremptory writ had been issued.   It thereupon,
without any communication to the college, took up the resolu-
tion. that was laid over "to gain further information on .the
subject" and unanimously adopted it.   In so doing the board
did not act without evidence.   The relator knew, prior to such
action, of its having violated the rules of the board as to its
standard of reputability and that it would be dealt with upon
an occasion arising therefor.   The relator was not notified
June 26th, or immediately prior thereto, that the board was
about to act upon applications for licenses made by the for-
mer's graduates.   The board did not act without any investi-
gation or any application for a license pending before it, or
without any change in the status of the relator tending to
prove it to be not reputable between May, 1903, and June 26,
1905.   The board did, as alleged, refuse to recognize the
diplomas of the relator issued to graduates of the class of
1905 as entitling them to licenses without examination and
persists in so doing.   Such refusal is based upon the decision
as to the reputability of the college in its dental department.
In making the decision the board did not act without evidence
tending to prove the school not reputable, or without notice to
the plaintiff, or without giving it opportunity to be heard, or
without due process of law, or otherwise than in the perform-
ance of its duties in good faith.

The return was amended by stating that at the time of the

passage of the resolution in question there were twenty-one applications for licenses on file with its secretary, made by members of the relator's graduating class for 1905, and supported by its certificates of graduation.

The court decided, in due form, that the board committed jurisdictional error in condemning the relator as not reputable, without notice and without opportunity to be heard upon specific charges brought to its attention. A judgment of reversal in due form was accordingly entered, from which this appeal was taken.

For the appellants there were briefs by the *Attorney General* and *Joseph B. Doe*, and oral argument by *Mr. Doe*. They contended, *inter alia*, that *certiorari* is an action. Secs. 2595, 2596, 2812, 2845*a*, Stats. 1898; *Morse v. Spees*, 25 Wis. 543; *McNamara v. Spees*, 25 Wis. 539; *Owens v. State*, 27 Wis. 456; *Starkweather v. Sawyer*, 63 Wis. 297, 300; *Auerbach v. Marks*, 94 Wis. 668, 673; *Lewis v. C. & N. W. R. Co.* 97 Wis. 368, 372; *State ex rel. Manitowoc v. Manitowoc Co.* 59 Wis. 15; *State ex rel. Green Bay & M. R. Co. v. Jennings*, 56 Wis. 113; *State ex rel. Court of Honor v. Giljohann*, 111 Wis. 377. The defendants are state officers within the meaning of ch. 411, Laws of 1903. Anderson, Law Dict. 728; 23 Am. & Eng. Ency. of Law (2d ed.) 327; *State ex rel. Clyatt v. Hocker*, 39 Fla. 477, 63 Am. St. Rep. 174; *State ex rel. Holmes v. Dillon*, 90 Mo. 229; *State ex rel. Kellogg v. Currens*, 111 Wis. 431; *State v. Vandersluis*, 42 Minn. 129; *State v. Creditor*, 44 Kan. 565; *Burch v. Hardwick*, 30 Grat. 24–31 *et seq.*; *Maxwell v. Hartmann*, 50 Wis. 660; *New York & H. R. R. Co. v. Mayor*, 1 Hilt. 562–568. The writ could not properly issue upon the petition of respondent. 4 Ency. Pl. & Pr. 165; *Elliott v. Superior Court*, 144 Cal. 501, 103 Am. St. Rep. 111; *Starkweather v. Seeley*, 45 Barb. 164; *Washington Co. A. Co. v. Stewart*, 9 Idaho, 376, 74 Pac. 955; *People ex rel. Finch v. Overseers of Poor*, 44 Barb. 467; *Pay v. Whitaker* (Tex.) 49 S. W. 367; *People ex rel. Lawrence*

*v. Schell,* 5 Lans. 352; *Scheiwe v. Holz,* 168 Ill. 432, 48
N. E. 65; *Watson v. May,* 6 Ala. 133; *Colden v. Botts,* 12
Wend. 234; *Smith v. Stevens,* 8 Ired. Law (N. C.) 38; *People ex rel. Lawson v. McCaffrey,* 42 Barb. 530.   Ch. 411,
Laws of 1903, is valid as a grant of legislative power.   *State
ex rel. N. C. Foster L. Co. v. Williams,* 123 Wis. 61, 67; *Ex
parte Frazer,* 54 Cal. 94; *Ex parte Cox,* 63 Cal. 21; *Ex parte
McNulty,* 77 Cal. 164, 19 Pac. 237; *In re Thompson,* 36
Wash. 377, 78 Pac. 899; *Harding v. People,* 10 Colo. 387,
15 Pac. 727; *State v. Vandersluis,* 42 Minn. 129, 43 N. W.
789, 6 L. R. A. 119; *Blue v. Beach,* 155 Ind. 121, 50 L. R.
A. 64; *State v. Briggs,* 45 Oreg. 366, 77 Pac. 750; *Singer v.
Maryland,* 72 Md. 464.   Ch. 411, Laws of 1903, is not
invalid as taking property without due process of law.   22
Am. & Eng. Ency. of Law (2d ed.) 780; *Reetz v. Michigan,* 188 U. S. 505; *Ex parte Whitley,* 144 Cal. 167, 77 Pac.
879, 894; *People ex rel. Sheppard v. Dental Examiners,* 110
Ill. 180; *Dent v. West Virginia,* 129 U. S. 114; *State v. Call,*
121 N. C. 643, 646, 28 S. E. 517; *Frances v. State,* 57 Ohio
St. 1, 47 N. E. 1041; *Gothard v. People,* 32 Colo. 11, 74 Pac.
890; *In re Thompson,* 36 Wash. 377, 78 Pac. 899; *State v.
Carey,* 4 Wash. 424, 30 Pac. 729; *State ex rel. Smith v. Dental Examiners,* 31 Wash. 492, 72 Pac. 110; *State ex rel. Kellogg v. Currens,* 111 Wis. 431; *State v. Heinemann,* 80 Wis.
253; *Wilcox v. Hemming,* 58 Wis. 144; *Wilkins v. State,* 113
Ind. 514, 16 N. E. 192; *State v. Hathaway,* 115 Mo. 36, 21
S. W. 1081; *Opinion of Justices,* 138 Mass. 601; *Scholle v.
State,* 90 Md. 729; *State Board of Health v. Roy,* 22 R. I.
538; *Parks v. State,* 159 Ind. 211; *Isenhour v. State,* 157
Ind. 517; *Ex parte Gerino,* 143 Cal. 412; *State v. Heath,* 125
Iowa, 585; *State ex rel. Port Royal M. Co. v. Hagood,* 30 S.
C. 519; *People ex rel. Cox v. Justices,* 7 Hun, 214; *Hildreth
v. Crawford,* 65 Iowa, 339; *Ex parte McNulty,* 77 Cal. 164,
19 Pac. 237; *State v. Vandersluis,* 42 Minn. 129, 43 N. W.
789; *Hewitt v. Charier,* 16 Pick. 353; *Eastman v. State,* 109

Ind. 278, 10 N. E. 97; *People v. Phippin,* 70 Mich. 6, 37 N. W. 888; *Richardson v. State,* 47 Ark. 562, 2 S. W. 187; *Ex parte Spinney,* 10 Nev. 323; *Harding v. People,* 10 Colo. 387, 15 Pac. 727; *Antle v. State,* 6 Tex. App. 202; *Musser v. Chase,* 29 Ohio St. 577; *Thompson v. Hazen,* 25 Me. 104; *State v. State Medical Board,* 32 Minn. 324, 20 N. W. 238. The selection of a certain number of the board from the State Dental Society does not render the law invalid. *Overshiner v. State,* 156 Ind. 187, 59 N. E. 468; *U. S. v. Breen,* 40 Fed. 402; *Ex parte Cox,* 63 Cal. 21. Whether a statute is reasonable or not is for the legislature and not for the courts. *State v. Creditor,* 44 Kan. 565, 24 Pac. 346; *Hedderich v. Smith,* 103 Ind. 203, 1 N. E. 47.

For the respondent there was a brief by *Timlin & Glicksman,* of counsel, and oral argument by *W. H. Timlin* and *H. J. Killilea.* They contended, *inter alia,* that respondent was entitled to the writ. *People ex rel. Forest Comm'r v. Campbell,* 152 N. Y. 51, 46 N. E. 176; *State ex rel. McGovern v. Trenton,* 60 N. J. Law, 402, 38 Atl. 636; *Tallon v. Hoboken,* 60 N. J. Law, 212, 37 Atl. 895; *Jersey City v. State ex rel. Traphagen,* 53 N. J. Law, 434, 22 Atl. 190; *Champion v. Board of Comm'rs,* 5 Dak. 416, 41 N. W. 739; *State ex rel. Enderlin State Bank v. Rose,* 4 N. Dak. 319, 58 N. W. 514, 26 L. R. A. 593; *People ex rel. Sheridan v. Andrews,* 52 N. Y. 445; *Rhode Island Society v. Budlong* (R. I.) 25 Atl. 657; *State ex rel. West Jersey T. Co. v. Camden,* 56 N. J. Law, 431, 29 Atl. 163; *Miller v. Jones,* 80 Ala. 89, 93; *State ex rel. Wood v. Goldstucker,* 40 Wis. 124; *State ex rel. Hallauer v. Gosnell,* 116 Wis. 606; *Flanagan v. Pierce,* 27 Tex. 78. There was no error in denying the motion for change of venue under ch. 366, Laws of 1905. (1) Because *certiorari* is not an action. *Neuman v. State,* 76 Wis. 112, 118; *People ex rel. Forest Comm'r v. Campbell,* 152 N. Y. 51, 46 N. E. 176. (2) Because if an action it is not against the state or against a state officer. *McCarty v. Ashland Co.*

61 Wis. 1; *State ex rel. Kempster v. Milwaukee*, 90 Wis. 487. Even if the board can be deemed state officers the action must be against them in their official capacity. Stats. 1898, notes of cases p. 2903; *Lynn v. Polk*, 8 Lea (Tenn.) 121, 128, 129; *Hodgson v. Nickell*, 69 Wis. 308. The State Board of Dental Examiners is a tribunal within the meaning of sec. 8, art. II, Const. *State ex rel. Cook v. Houser*, 122 Wis. 534, 561; *Hayward v. Bath*, 35 N. H. 514; *State ex rel. Gilbert v. Police & Fire Comm'rs*, 11 Utah, 378, 40 Pac. 264; *Cunningham v. Squires*, 2 W. Va. 422; *Sherman Dist. Board v. Hopkins*, 19 W. Va. 84; *Chenowith v. Randolph Co.* 26 W. Va. 230; *Poteet v. Comm'rs*, 30 W. Va. 58, 8 S. E. 97; *Alderson v. Comm'rs*, 31 W. Va. 634, 8 S. E. 274; *Bartlett v. L. Bartlett & Son Co.* 116 Wis. 450, 465; *State ex rel. Kelleher v. School Board*, 134 Mo. 296, 35 S. W. 619; *Illinois State Board of Dental Examiners v. People ex rel. Cooper*, 123 Ill. 227, 13 N. E. 201; *Strong, Petitioner*, 20 Pick. 495; *Merrick v. Arbela*, 41 Mich. 630, 2 N. W. 922. Ch. 411, Laws of 1903, is unconstitutional (1) in that it is not a law, but an enactment attempting to confer upon the State Board of Dental Examiners the power to make law and pronounce a decision in any particular case without restraint of rule. *People ex rel. Robison v. Miner*, 68 Mich. 549, 37 N. W. 21, 24; *Yick Wo v. Hopkins*, 118 U. S. 356; *Baltimore v. Radecke*, 49 Md. 217; *State ex rel. Garrabad v. Dering*, 84 Wis. 585; *Matter of Frazee*, 63 Mich. 396; *Gundling v. Chicago*, 177 U. S. 183; *Austin v. Murray*, 16 Pick. 121; *People ex rel. Kuhn v. Common Council*, 70 Mich. 534, 38 N. W. 470; *Plymouth v. Schultheis*, 135 Ind. 339, 35 N. E. 12; *Ex parte Jackson*, 45 Ark. 158, 164; *Ex parte Cox*, 63 Cal. 21; *Dunham v. Hough*, 80 Mich. 648, 45 N. W. 497; *Elkhart v. Murray* (Ind.) 75 N. E. 593. (2) In that it confers power to decide the reputation and property rights of respondent without notice or hearing to the person or corporation whose rights are injuriously affected. *Dietz v. Neenah*, 91 Wis. 422; *Schiltz v. Roenitz*,

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

86 Wis. 31; *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112; *Grand Rapids v. Powers,* 89 Mich. 94, 50 N. W. 661; *Lathrop v. Racine,* 119 Wis. 461; *State v. Brown,* 37 Wash. 97, 106, 68 L. R. A. 889; *State ex rel. Wood v. Goldstucker,* 40 Wis. 124; *Miller v. Jones,* 80 Ala. 89; *King v. Hayes,* 80 Me. 206, 13 Atl. 882. (3) In that it provides that the enumerated powers are conferred on a board, a majority of whom are required to be members of a college or named society and all of whom may be selected by the governor from persons recognized by that college or society. *Black v. State,* 113 Wis. 205, 219, 226; *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 549; *State v. Whitcom,* 122 Wis. 110; *Clark v. Board,* 24 Iowa, 266; *State v. Garbroski,* 111 Iowa, 496, 56 L. R. A. 570; *Rathbone v. Wirth* (N. Y.) 45 N. E. 15; *Fordyce v. State ex rel. Kelleher,* 115 Wis. 608; *Wright v. Hart,* 182 N. Y. 330, 75 N. E. 404. (4) In that it denies the right to study dentistry to persons not possessing qualifications therein mentioned, which requirements cannot be upheld under the police power. *Bessette v. People,* 193 Ill. 334, 56 L. R. A. 562; *Lawton v. Steele,* 152 U. S. 133; *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530; *State ex rel. McKell v. Robins,* 71 Ohio St. 273, 73 N. E. 470; *Allgeyer v. Louisiana,* 165 U. S. 578, 589; *Butchers' Union Co. v. Crescent City Co.* 111 U. S. 746; *Matter of Jacobs,* 98 N. Y. 98; *Gough v. Dorsey,* 27 Wis. 119; *Milwaukee Industrial School v. Milwaukee Co.* 40 Wis. 328.

MARSHALL, J. It is provided by ch. 366, Laws of 1905, that "the place of trial of all actions authorized to be brought against the state or any of the state officers in their official capacity shall be Dane county." Counsel concede that whether error was committed in denying the motion to change the place of trial turns on the solution of these points:

First. Is a *certiorari* proceeding an action? Second. Are members of the State Board of Dental Examiners state officers within the meaning of the law under consideration?

1. It is not entirely without difficulty that proceedings commenced by original writs were classified with reference to the two kinds of judicial remedies under the Code. The old system which was superseded thereby furnished some aid' in the matter. By such aid, the general scheme of the statutes and the procedure required, a conclusion was logically reached that they should be regarded as actions. *Paine v. Chase,* 14 Wis. 653; *State ex rel. Green Bay & M. R. Co. v. Jennings,* 56 Wis. 113, 14 N. W. 28; *State ex rel. Manitowoc v. Manitowoc Co.* 59 Wis. 15, 16 N. W. 617; *State ex rel. Drury v. Lincoln,* 67 Wis. 274, 30 N. W. 360; *State ex rel. Buchanan v. Kellogg,* 95 Wis. 672, 70 N. W. 300; *State ex rel. Rice v. Chittenden,* 107 Wis. 354, 83 N. W. 635; *State ex rel. Durner v. Huegin,* 110 Wis. 189, 222, 85 N. W. 1046; *State ex rel. Court of Honor v. Giljohann,* 111 Wis. 377, 384, 87 N. W. 245; *State ex rel. Risch v. Trustees,* 121 Wis. 44, 58, 98 N. W. 954. True, that is not in harmony, strictly, with the letter of the Code. The remedies afforded by original writs are commonly of a civil nature, and sec. 2629, Stats. 1898, provides that a civil action shall be commenced by summons. Construed strictly that does not apply to a remedy invocable only by a judicial writ.

By sec. 2594 all judicial remedies are divided into actions and special proceedings. By sec. 2595 the former includes every "proceeding in a court of justice by which a party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense." By sec. 2596 the latter includes every other proceeding. Actions are subdivided into two classes, criminal and civil. Sec. 2597. The former includes every action prosecuted by the state as a party against a person charged with a public offense for the punishment thereof. Sec. 2598. ·The latter includes all others (sec. 2599), whether prior to the Code denominated actions at law or suits in equity, the distinctions in that regard and the forms in respect thereto being abolished and wholly superseded by

the civil action of the Code. Sec. 2600. The appeal statutes were framed in harmony therewith, the right of appeal as to a final determination of an action being conferred separate and distinct (sec. 3047) from the right of appeal as to intermediate orders, orders in special proceedings, and others (sec. 3069). A proceeding instituted by the issuance of one of the original writs mentioned must fall within those denominated actions. A writ of error to review, on the merits, a final judgment is in no sense a proceeding in an action, but is a new proceeding to review a final judgment rendered in an action in a court different from the one issuing the writ. *Paine v. Chase, supra.* The writ of *habeas corpus* is used to institute a proceeding for the vindication of the right to personal liberty. *State ex rel. Durner v. Huegin, supra.* Such a proceeding is not in a prosecution, but "is a new suit to enforce a civil right." WAITE, C. J., in *Ex parte Tom Tong,* 108 U. S. 556, 2 Sup. Ct. 871. Likewise the issuance of a writ of *certiorari* is essentially the commencement of a proceeding independent of that to be reveiwed. It is a remedy afforded by law to enable one who has been, or may be, injured by a determination of a judicial nature, good merely in form, but void for jurisdictional error to vacate it. It is in many cases the only remedy by which the right of the matter can be directly vindicated.

The procedure in all cases above mentioned must necessarily assimilate to that of actions, strictly so called, not to that of special proceedings. *State ex rel. Risch v. Trustees, supra.* There must be papers in the nature of pleadings whether they are called such or not. There must be a trial, which in many cases may include the solution of questions of fact. The issues are commonly placed on the calendar for trial, in all respects like those in other actions. The rules of court expressly provide therefor in *certiorari* actions, and recognize that they should be brought to a hearing in the circuit court upon the usual notice of trial. Sec. 4, rule XXX, Circuit

Court Rules.    The proceeding is closable only by a judgment.

The court established the practice as indicated by a series of decisions.    At the outset it was said that the sufficiency of the writ and the return should be tested by ordinary rules and proceedings applicable to pleadings.    *State ex rel. Green Bay & M. R. Co. v. Jennings, supra.*    That was said to be the rule, the proceeding being a suit.    That is hardly accurate, since a suit, strictly speaking, is unknown to the Code.    The idea in mind was that the fact that at common law the proceeding was denominated a suit, is to be remembered in connection with the substitution by the Code of the civil action for all common-law remedies denominated suits or actions.    In *Starkweather v. Sawyer,* 63 Wis. 297, 300, 23 N. W. 566, it was said that a *certiorari* proceeding must be closed by a judgment.    Later it was held that such a final determination is a judgment under the appeal statute.    *State ex rel. Court of Honor v. Giljohann, supra.*    Still later it was held that the proceeding is an action under the cost statute. *State ex rel. Risch v. Trustees, supra.*    In *State ex rel. Durner v. Huegin, supra,* it was stated that before the Code an original writ was issued to commence a proceeding denominated a suit, and that the abrogation of suits and the substitution therefor of the action of the Code made such a proceeding, though not technically within the meaning of sec. 2597, an action, but such clearly within the broad meaning of sec. 2595, which must be deemed to refer to all remedies displaced by the civil action of the Code.    That was restated in *State ex rel. Risch v. Trustees, supra,* where the language formerly used was somewhat amplified, it being said that the constitutional grant of authority to use the common-law writs carried with it, necessarily, the right to use them with the functions applicable thereto before the Code, which included the commencement of proceedings called suits; that the abrogation of suits and substitution in place thereof of a civil action could

·not be recognized as changing the function of the writs as preserved by the constitution.

It follows that the issuance of an original writ is to be deemed to all intents and purposes the commencement of an action in the statutory sense, characterized by proceedings in the nature of pleadings, by issues, by the trial thereof, by a judgment with the incident of costs to the prevailing party, and the right of appeal.

In the above discussion we have treated the writ of *certiorari* as one of several original writs necessarily governed by the same rules. All of our decisions on the subject are in harmony therewith, and with authorities elsewhere. *Hendrix v. Kellogg,* 32 Ga. 435, 437; *Kohl v. U. S.* 91 U. S. 367; *Marion v. Ganby,* 68 Iowa, 142, 26 N. W. 40; *Holmes v. Jennison,* 14 Pet. 540; *Coston v. Coston,* 25 Md. 500, 507; *State v. Newell,* 13 Mont. 302, 304; *Hartman v. Greenhow,* 102 U. S. 672; *American Exp. Co. v. Michigan,* 177 U. S. 404, 20 Sup. Ct. 695; *Roadhouse v. Briggs,* 194 Ill. 435, 62 N. E. 778; *McBane v. People ex rel. Stout,* 50 Ill. 503; *Weston v. Charleston,* 2 Pet. 449; *People v. Clarke,* 9 N. Y. 349; *Cohens v. Virginia,* 6 Wheat. 264, 409; *Ex parte Miller,* 129 Ala. 130, 30 South. 611.

2. The term "state officers," used in the act under consideration, is sometimes construed as meaning only heads of the executive departments of the state elected by the people at large, such as governor, lieutenant governor, state treasurer, secretary of state, attorney general, and the like. In its more comprehensive sense it includes every person whose duties appertain to the state at large. The exact sense in which the term is used in any particular law must often be determined by ordinary rules for judicial construction. One of the cardinal rules thereof is, a meaning should not be attributed to words leading to absurd consequences. That at once, we should say, narrows the meaning of the term here to its more restrictive and ordinary signification. Otherwise, it would

apply to all actions wherever commenced in the state, regardless of the residence or principal place of abode, or official residence of the parties, in the event of the defendant being sued in his official capacity and his possible field of operations extending to the whole state. That would include every member of each of the numerous legislative creations called boards or commissions, every notary public, every state game warden and his deputies, and a multitude of other officers. Such a construction would turn a law, evidently intended to prevent unnecessary disturbance of public affairs, into one of an opposite character.

The state officers, heads of departments who have their official residence at the capitol of the state and who are expected to keep open office there during business hours and, generally speaking, to be there themselves, might be greatly prejudiced, and the public welfare as well, by their being required to attend trials of actions in their official capacities in distant parts of the state. The reason of the law seems to strictly confine it to such officers. To extend it further would necessarily advance its boundaries so as to include all persons to whom the term in any reasonable sense could apply. So we reach the conclusion that the legislature used it in its restrictive sense,— the one which commonly occurs to the mind when the words are spoken. Courts elsewhere, in similar circumstances, have said that, as a general rule, it applies only in that sense. *State ex rel. Stearns v. Smith,* 6 Wash. 496, 33 Pac. 974.

Appellants' counsel question the right of respondent to the remedy accorded, insisting that the latter is neither interested in nor a party to the proceeding complained of. If the premises are correct the conclusion itself cannot well be questioned.

Obviously the very life of respondent, as to its dental department, depends upon whether its certificates of graduation, in themselves, constitute an efficient password, so to speak, at the door which the law-making power has seen fit to erect between the outside and the inside of the dental profession. It

is no answer to respondent's position to say that a graduate is not by a sentence of nonreputability passed upon his *alma mater* precluded from approaching the bar of the official board on his merits, and, by showing actual qualifications for the profession of dentistry, obtain the coveted license. A college cannot exist without revenue. It cannot have revenue without patrons. It cannot have patrons unless it can send its finished students out, in due course, to enter into the activities of the profession with the requisite character to secure admission thereto on that alone. It cannot have essential competency in that regard, unless it possesses in fact, and in the judgment of the official state board, reputability; character as an institution of learning satisfactory to such board. The board is the sole judge in the matter, subject to a revision of its decision for reasonableness. It holds in its hands, under the present system, the destiny of the college. In case of the latter having done all that is reasonable to satisfy the legislative idea of reputability, whether it shall "live or die, survive or perish," is within the province of the appellants to determine, subject to such review of its decision as the law of the land may afford, in case of an abuse of its authority either in respect to the standard required or failure to reasonably observe established rules, precedents, and methods in arriving at its conclusion. *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 88 N. W. 587.

From what has been said we need not spend much time supporting disaffirmance of the proposition that respondent had no interest in the decision of the board as to its reputability. Whether we view the case upon the theory that the decision occurred incidental to the primary matter of passing upon applications for licenses, or the theory that the primary matter was the status of the college, makes no difference with the final result as we shall see. If the action of the board was a mere incidental decision, nevertheless the college was an interested party on principle and under the decisions of this court

in the case cited. It was there held that such a decision may be regarded as settling the status of the college until subsequent events shall reasonably require re-investigation of the matter. So the incidental decision here, if that be its character, had all the force, as regards injurious effects upon the college, of one rendered in a direct proceeding against it.

The failure of the premises upon which the logic of appellants' counsel rests involves a concession, it seems, that if the decision of the board was one which it might properly have made under any circumstances, it was subject to be reviewed upon *certiorari,* if respondent was competent to sue out the writ. It is not an absolute essential to competency in such cases that the petitioner should be a party to the record in the proceeding sought to be reviewed, nor necessary that he should be the party wronged, as regards a proper citation being essential to jurisdiction of the subject matter. A good illustration of that is found in *State ex rel. Graef v. Forest Co.* 74 Wis. 610, 43 N. W. 551, where *certiorari* at the instance of a taxpayer—injuriously affected by the determination of his county board changing the boundaries of two towns and organizing a new one—was sustained to test the validity of the board's action. Analogous to that case are *State ex rel. Wood v. Goldstucker,* 40 Wis. 124, and *State ex rel. Hallauer v. Gosnell,* 116 Wis. 606, 93 N. W. 542.

Authorities may readily be found to the effect that no one is entitled to a writ of *certiorari* to review a proceeding to which he is not a party, but a careful examination thereof will show that they do not go to the extent of limiting the use of the writ to parties to the record. The essential of competency to use the writ, if the court in its discretion sees fit to permit it, is that the applicant is a party to the record or a party, in that the decision is directed against him or his property, or a party constructively, in that the enforcement of the decision would involve special, immediate, and, in effect at least, a direct injury to his interests. In such circumstances, if he has

no other remedy reasonably available, the court may in its discretion, and must if in the exercise of sound discretion it ought to, give him the use of its original writ of *certiorari* to vindicate his right. The law is quite comprehensively stated in respect to the matter in 4 Ency. Pl. & Pr. 167, thus:

"The writ will not be issued on the application of one who has no ground of complaint, whether the applicant therefor is a party to the proceedings or not. Where, however, the applicant for the writ has been actually aggrieved by the proceedings of which he complains, and the proceedings are reviewable by *certiorari,* he is entitled to the writ."

"In considering whether or not the person is the proper party to apply for the writ, the court frequently exercises its discretion."

"The court should be satisfied before allowing or acting upon the writ, that the issuance of the writ is essential to prevent some substantial injury to the applicant; and it devolves upon the applicant to show his right to prosecute the writ."

"The applicant must have grievances of his own, and must not base his right to the writ on the ground that the rights of others have been infringed."

The following are good applications of the foregoing stated doctrine: *People ex rel. Sheridan v. Andrews,* 52 N. Y. 445; *People ex rel. Youmans v. Wagner,* 7 Lans. 467; *Palmer v. Circuit Judge,* 83 Mich. 528, 47 N. W. 355; *Strong v. County Comm'rs,* 31 Me. 578; *People ex rel. Allen v. Knowles,* 47 N. Y. 415; *Stone v. Miller,* 60 Iowa, 243, 14 N. W. 781; *Groves v. Richmond,* 53 Iowa, 570, 5 N. W. 763; *Welch v. County Court,* 29 W. Va. 63, 1 S. E. 337; *Miller v. Jones,* 80 Ala. 89; *Tallon v. Hoboken,* 60 N. J. Law, 212, 37 Atl. 895; Wood, Mandamus (2d ed.) 151.

It may be that some of the cases cited are on rather extreme lines. Certain it is that some of them go much further than is necessary for the purposes of this one. We are not unmindful that the writ of *certiorari* is not issuable for purpose of reviewing the exercise of legislative discretion (*People ex rel.*

*Jamaica v. Queens Co.* 131 N. Y. 468, 30 N. E. 488), or a mere administrative matter (*State ex rel. Anderson v. Timme*, 70 Wis. 627, 36 N. W. 325), or proceedings in form judicial of a mere usurper (*State ex rel. Schaefer v. Schroff*, 123 Wis. 98, 100 N. W. 1030).

The true rule deducible from the authorities is this: In the exercise of its discretionary authority a court of general jurisdiction,—upon the application of any party to a judicial proceeding, or person interested in a proceeding of a judicial or *quasi*-judicial nature, because of some special or peculiar injury to himself in person or property, for which he had no other reasonably available remedy,—may grant the use of its writ of *certiorari* to review the same for jurisdictional error, and upon reasonably clear *prima facie* showing in that regard discretionary authority should be so exercised. This treatment, in the main, relates only to injury where the proceeding is not against the person or property of the applicant for the writ. It does not include to the fullest extent the right to the writ where the proceeding is direct,—those cases where citation to the person in some reasonable way is requisite to jurisdiction of the subject matter.

Counsel for respondent go further than to merely answer the contention of counsel for appellants on the proposition that the writ was improvidently issued because the decision challenged was merely incidental to passing on applications for licenses, and that the college had no such interest in the matter as to warrant the court in permitting a judicial review thereof in the manner attempted; claiming that the decision did not relate solely to a mere incidental matter involved in an issue between the board and applicants for licenses, but was in the nature of a proceeding directly against the college itself; a decision intended to have a general effect, and that as the proceeding was *in rem*, the college, as the possessor of the *res*, was not only a proper but a necessary party, rendering

essential some reasonably efficient notice to it and opportunity to be heard, as a condition of jurisdiction of the subject matter.

We incline to the view that the decision of the board cannot be construed as a mere incidental conclusion. The proceedings leading up to it strongly, if they do not conclusively, indicate that, in form and purpose, they were direct, the people at large being on the one side and the college, or it and those holding its certificates of graduation, on the other. There were applications for licenses on file, but they had not been taken up for consideration prior to the making of the decision, nor were they at the time thereof, so far as appears, specially or even incidentally under consideration. No notice was given to the applicants, as was done on former occasions, to appear and make proof. It does not appear that the applications in hand were specially thought of. The attention of the board was directed solely to the situation of the students who had not yet received their diplomas and the attitude of the college in respect thereto. So little attention was paid to the applications for licenses, that the matter was not called to mind when the return was made and it became necessary, in order to make a complete showing in the return, to bring in the facts in that regard by amendment. The entire history of the matter, as indicated in general terms by the statement, and as will appear in more detail hereafter, shows pretty clearly that at least the primary matter involved was the character of the college. The decision went directly against it and incidentally, if at all, against pending or anticipated applications for licenses. Doubtless, whether the proceedings were directly against the college by itself, or against it and applicants for licenses as uniting two primary matters, is not material since the rule as to notification to the former and opportunity to be heard before condemnation would be the same in one case as in the other.

The foregoing leads to the interesting question of whether

notice to the college was necessary to jurisdiction of the subject matter by the board. That the decision affects its material interests has been sufficiently shown. If that resulted from a mere exercise of legislative discretion, it would not be remediable by *certiorari,* as we have seen. Neither would it be if it resulted from the reasonable exercise of judicial discretion, or a decision judicial in form, which was wholly a usurpation, *i. e.* one which the board would not have jurisdiction to make under any circumstances, waiving constitutional and other questions. It has been suggested that the latter is more nearly its character than any that can be suggested; that it was a mere "fulmination" which did not and could not injure the college because the board had no jurisdiction, under any circumstances, to act generally upon the subject of the status of the college. That suggestion, if any going to the character of the decision, is at this point entitled to consideration.

Manifestly, if the board had any function in the matter it was of a judicial nature. That was distinctly held, in conformity to elementary principles and decisions in similar cases, in *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 88 N. W. 587. Every court that has passed upon a similar law has so held, so far as we can discover. The following language in *Williams v. Dental Examiners,* 93 Tenn. 619, 27 S. W. 1019, is in line with expressions of this court:

"It is evident that it was the purpose of the legislature to lodge it in the board of examiners created by the act. . . . In performing their duties, the board is exercising a *quasi*-judicial function, and, so long as it does not act arbitrarily and illegally, its determination cannot be coerced."

In *People ex rel. Sheppard v. Dental Examiners,* 110 Ill. 180, the court spoke likewise, as follows:

"These questions of fact," relating to reputability, "are, by the act, submitted to the decision of the board,—not in so many words, but by the plainest and most necessary implication. Their action is to be predicated upon the existence of the requisite facts, and no other tribunal is authorized to in-

vestigate them, and of necessity, therefore, they must do so. The act of ascertaining and determining what are the facts, is in its nature judicial. It involves investigation, judgment, and discretion."

To the same effect are *State ex rel. Granville v. Gregory,* 83 Mo. 123; *State ex rel. Powell v. State Med. Exam. Board,* 32 Minn. 324, 20 N. W. 238; *France v. State,* 57 Ohio St. 1, 47 N. E. 1041. All courts which have considered the matter have rejected the ideas sometimes advanced that such delegations of authority contravene the constitution vesting legislative authority in the senate and assembly and judicial authority in the courts. The authority conferred is neither legislative nor judicial in a constitutional sense. It is authority to determine questions of fact required to be solved by the exercise of judgment preliminary to performance of purely administrative duties. The constitutional authority vested in the legislature appertains wholly to the making of law. That vested in such boards as we have here appertains wholly to the administration of law. The judicial power vested by the constitution in courts relates to that administration of remedies for remediable rights formerly exercised exclusively by courts. The discretionary, denominated *quasi-*judicial, authority vested in such boards as the one in question is a necessary incident of purely administrative duties. The two, in many branches of civil government, are inseparable, and have no similarity to authority exercisable by courts through the instrumentality of judicial remedies. The following citations are but a few which might be mentioned where this subject has been treated in cases similar to the one in hand: *State v. Heinemann,* 80 Wis. 253, 49 N. W. 818; *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 87 N. W. 561; *State v. Dent,* 25 W. Va. 1; *Dent v. West Virginia,* 129 U. S. 114, 9 Sup. Ct. 231; *Reetz v. Michigan,* 188 U. S. 505, 23 Sup. Ct. 390; *France v. State,* 57 Ohio St. 1, 47 N. E. 1041; *State v. Harmon,* 31 Ohio St. 250; *Elmore v. Overton,* 104 Ind. 548, 4

N. E. 197; *Ex parte Whitley,* 144 Cal. 167, 77 Pac. 879; *Los Angeles Co. v. Spencer,* 126 Cal. 670, 59 Pac. 202; *State v. Hathaway,* 115 Mo. 36, 21 S. W. 1081; *Flournoy v. Jeffersonville,* 17 Ind. 169; *Wilkins v. State,* 113 Ind. 514, 16 N. E. 192; *State ex rel. Burroughs v. Webster,* 150 Ind. 607, 50 N. E. 750; *State Board of Health v. Roy,* 22 R. I. 538, 48 Atl. 802; *People v. Hasbrouck,* 11 Utah, 291, 39 Pac. 918.

May the board, in anticipation of necessity for the exercise of its administrative functions, and upon being invoked to do so by the party on the one side chiefly interested (the college), investigate and pass judicially upon its reputability, establish its status for purposes past and future, subject to reasonable revision of the matter upon any change occurring fairly calling therefor? True, there is no express delegation of such authority in the written law, there was no express delegation of such authority in the law prior to the act of 1903, nor to pass upon the matter of reputability at all, nor is there in any of the many similar laws in other states, where it has been held that the latter authority exists by necessary implication. As stated by the Illinois court:

"The establishment of the reputability of the college seems to be one of the primary duties of the board. It is essential to the exercise of its administrative functions. It is the sole tribunal to determine the matter. Its determination once made is *prima facie* binding. It is binding absolutely in all courts and places, subject to review for jurisdictional error until changed reasonably by the board itself."

The rule applies that "when the existence of a person, a personal relation, or a state of things is once established by proof, the law presumes that the person, relation, or state of things continues to exist as before, until the contrary is shown, or until a different presumption is raised, from the nature of the subject in question." Those principles were all definitely laid down in *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 88 N. W. 587. The law as there construed, not only does not

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

require but does not permit the college to be challenged, as regards its reputability, upon every occasion of the board being called upon to perform its administrative function of issuing a license to one of the former's graduates. It contemplates that the status of the institution being once regularly established the decision in that regard will be reasonably permanent, so that applicants for licenses, and persons desiring to be matriculated at the college as well, can rely thereon, conditions not efficiently changing. It would seem that to confer on the board jurisdiction so that, upon every occasion of its administrative function being set in motion, regardless of its having previously determined the status of the institution involved, and no change in the meantime, the reputability of such institution may be inquired into,—would so shock the reason as to cause hesitancy, at least, to believe the legislature could so have intended.

Our conclusion is that under the present system of legislative regulation of the profession of dentistry and of the character of educational institutions preparing candidates therefor, the status of such an institution, as to whether reputable or not, is a matter of public importance in which the candidates holding certificates of graduation and the institution and the public at large are independent parties, and the official board is the sole tribunal to adjudicate in regard thereto; and that it may be set in motion, respecting the matter, by an application for a license, or may on its own motion, in anticipation of the fact becoming essential to the execution of its administrative functions, or for the benefit of all whom it may concern, move in such matter, or it may be set in motion by the college and required to so act, to the end that the corporation may act advantageously and justly to the public in soliciting patronage and in sending its graduates out on the pretense, evidenced in the usual way, of their being qualified to enter successfully into the profession of dentistry. Whenever the thing denominated status is a matter of public importance by principles of common law or by the letter or spirit of the

written law, such as the condition of marriage, citizenship, parentage, residence, legal settlement, and many other matters that might be mentioned, the question in respect thereto is a legitimate matter for judicial determination by a tribunal having jurisdiction of the *res.* Proceedings of that sort are regarded as *in rem,* the same in all respects as if the thing were of a tangible character. The whole world, so to speak, is regarded as a party. The person directly affected is deemed to be so specially interested as to be entitled, under constitutional guaranties, as regards due process of law, the equal protection of the laws, and the general principles of free government, to some reasonable opportunity to be heard. There are many cases on this subject. The following are a few of them: *State ex rel. Kickbush v. Hœflinger,* 35 Wis. 393; *State ex rel. Atkinson v. McDonald,* 108 Wis. 8, 84 N. W. 171; *Spratt v. Spratt,* 4 Pet. 393; *McCarthy v. Marsh,* 5 N. Y. 263; *Cabot v. Washington,* 41 Vt. 168; *Hood v. Hood,* 110 Mass. 463; *Smith v. Smith,* 13 Gray, 209; *Pittsford v. Chittenden,* 58 Vt. 49, 3 Atl. 323; *Ross v. Ross,* 129 Mass. 243. Judge Elliott in his work on Practice (vol. 1, §§ 245, 246) treats this matter at considerable length, and states the general proposition thus:

"Where a court is empowered to investigate the law or the facts of a particular matter respecting the status of a person, or of a thing, it necessarily acts in a judicial capacity and its judgment or decree is the product of judicial power. In determining the status of a person, where by law it is required to investigate and determine that question, the court exercises judicial functions. . . . With the *res* before it, the capacity to proceed, and a right or duty to decide, the decision must, certainly, be something more than an impotent declaration or a mere collection of meaningless words. The denial that there is power in a decision in such a matter is an affirmation that the court's proceeding is idle,—in truth a mere shallow pretense,—but the concession that there is vitality in it is an affirmation that it is entitled to faith and credit as the adjudication of a court."

That language, as will be seen, was used with reference to judicial action by courts, but, obviously, it applies the same wherever the action is of a judicial nature.    It applies necessarily in a case of the exercise of *quasi*-judicial authority as well as judicial authority, strictly so called, to the extent of the binding effect of any *quasi*-judicial decision.

That supports the position of counsel for respondent,— that regarding the proceedings *in rem,* as they essentially were, the college was an indispensable party thereto, and reasonable citation to ·it and opportunity to know the precise points to be investigated, to meet the evidence produced against it with some reasonable semblance of a judicial inquiry, and to produce evidence in its own behalf according to the ordinary course for such proceedings, was essential to jurisdiction to make any determination whatever.

It would seem that the proposition stated needs no further discussion.    Granted that the proceeding was *in rem,* it follows that notice and opportunity to the possessor of the *res* should have been given as claimed.    One of the fundamental. principles of our system of government is that no one shall be condemned, as to his person or property, without due process of law.    That is well within the letter, and, manifestly, within the spirit of the fourteenth amendment to the national' constitution, with our constitutional guaranty as to a firm adherence to the fundamental principles of justice, sec. 22, art. I, Const. of Wis., and that comprehensive, basic guaranty making the constitution as a whole a recognition and pledge for the preservation of the rights to life, liberty, and the pursuit of happiness.    Sec. 1, art. I, Const. of Wis.

Due process of law does not mean merely according to the will of the legislature, or the will of some judicial or *quasi*-judicial body upon whom it may confer authority.    It means according to the law of the land, including the constitution with its guarantees and the legislative enactments and rules duly made by its authority, so far as they are consistent with.

constitutional limitations. It excludes all mere arbitrary dealings with persons or property. It excludes all interference not according to the established principles of justice, one of the most familiar of them being the right and opportunity for a hearing, to meet opposing evidence and oppose with evidence, according to the established principles of fair investigation to determine the justice of the case, before judgment affecting personal or property rights shall be pronounced. *Siefert v. Brooks,* 34 Wis. 443; *State ex rel. Flint v. Fond du Lac,* 42 Wis. 287. In the first case cited, in the language of DIXON, C. J., the court stated the doctrine thus:

"If the whole proceeding be *ex parte* or without notice, where notice should be given, or if such be the character of the determinatory act, the law condemns it *in toto,* and disregards it from the beginning. That every man is entitled to his day in court, and must have it, and cannot be affected in his person or his property, unheard or without the privilege secured to him of appearing or being represented in his own defense, if he so desires, is a maxim the force and importance of which every good lawyer appreciates, and one which no court ever surrenders."

These circumstances are essential to jurisdiction in all actions *in rem:* 1. The *res* must be within the jurisdiction of the court. That is satisfied in case of tangible things by their physical location within the scope of the court's authority. It is satisfied in case of intangible things, such as status, by jurisdiction of the person whose relations to the public are to be established. 2. There must be personal notice to the possessor of the *res* and opportunity for him to have his day in court, where the statute requires it, and also in case of its being silent on the subject, when such notice can reasonably be given, and in other cases there must be reasonable constructive notice.

From the foregoing it seems quite clear that whether we view the position of the board as that of having decided on the reputability of respondent incidental to the exercise of purely

administrative duties, or having determined the status of the college in a general way as in a direct proceeding solely *in rem,* or having determined the matter as involving two primary matters, still it was competent for the court to permit the use of its writ of *certiorari* for a review of the decision to some extent at least; that in the first situation notice to the college was not essential to jurisdiction of the subject matter, so the writ could reach only error proper to be considered irrespective thereof; that in either of the other two the legitimate scope of the inquiry included that which would be excluded in the first situation and all included in it as well. The claim of counsel as to such scope, suggested on the argument, is somewhat extraordinary, especially in view of the course of decisions in this state, but it was made with such confidence as to challenge somewhat more than a mere passing notice.

It is said that the writ of *certiorari* under the constitutional grants to circuit courts should be given the full scope of a writ of error, supplementing the appeal statute where necessary to reach the real justice of the case, all errors assigned, whether jurisdictional or judicial, being examined, and if it is thought that such extraordinary scope cannot be recognized, though the writ has been denominated in the cause one of *certiorari,* it should be deemed to be one of those new writs which it has been suggested a court may properly issue where the ends of justice cannot otherwise be attained.

In support of the proposition stated, our attention is directed earnestly to this language in sec. 8, art. VII, of the state constitution:

"Circuit courts shall have . . . appellate jurisdiction from all inferior courts and tribunals, and a supervisory control over the same. They shall also have the power to issue writs of *habeas corpus, mandamus,* injunction, *quo warranto, certiorari,* and all other writs necessary to . . . give them a general control over inferior courts and jurisdictions."

That, it is argued, grants appellate jurisdiction and by necessary implication the right of review as upon an appeal.

Counsel fail to distinguish between appellate jurisdiction and the right of appeal. The former only is granted by the constitution, the latter is a mere legislative creation. The legislature is supreme in the matter. It may grant the right of appeal from some inferior courts and not from others, or from courts only, or from courts and tribunals exercising *quasi-*judicial authority as well; or may grant the right in some cases and not in others, and having granted it take it away. Without legislative action creating the right in any given case in plain language, or by necessary implication, it would be usurpation for the court, on the mere faith of its constitutional grant of appellate jurisdiction, to entertain an appeal. The appellate power of circuit courts must remain in abeyance, except just in so far as it has been, or shall be, given vitality by legislative authority. *Mitchell v. Kennedy,* 1 Wis. 511; *Lancaster v. Barr,* 25 Wis. 560; *Eureka S. H. Co. v. Sloteman,* 67 Wis. 118, 30 N. W. 241; *State ex rel. Tewalt v. Pollard,* 112 Wis. 232, 87 N. W. 1107.

The constitutional provision in question was taken *verbatim* from Michigan, where the holdings before and since its adoption are in harmony with our own. *People ex rel. Jeschly v. Police Justice,* 7 Mich. 456; *Demaray v. Little,* 17 Mich. 386; *Maxfield v. Freeman,* 39 Mich. 64; *Kundinger v. Saginaw,* 59 Mich. 355, 26 N. W. 634; *Sullivan v. Haug,* 82 Mich. 548, 553, 46 N. W. 795; *Messenger v. Teagan,* 106 Mich. 654, 64 N. W. 499. CHAMPLIN, C. J., in *Sullivan v. Haug, supra,* said:

There is no "inherent right to appeal from a judgment of an inferior to a court of superior jurisdiction for the purpose of securing a second trial upon the merits. The right of appeal is and always has been statutory, and does not exist at common law. It is a remedy which the legislature may in its discretion grant or take away . . . and unless the statute . . . provides for an appeal . . . none can be taken."

But it is said that the constitutional grant of "general control over inferior jurisdictions," such as that of boards like-

the one in question, with the right to issue certain writs, in-cluding that of *certiorari*, "and all other writs necessary to carry into effect their orders, judgments and decrees," is suf-ficient to afford circuit courts power to review proceedings of an inferior tribunal to the fullest extent. Here comes in the idea that if some one of the writs mentioned is not appropriate for a full review the court may invent a new one. We are not unmindful that the learned chief justice who wrote the opinion in *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, 515, sug-gested that such power of invention existed as "a secret in law," quoting from Lord Coke. That suggestion has led to more than one urgent appeal to this court, and probably others to circuit courts, to give vitality to such secret, but without success so far as we are aware. If there be such a secret, the fact that during the more than a century which has elapsed since Lord Coke so suggested, it has never been called into requisition, renders strikingly significant the inventive genius of the early architects of the common-law system. The so-called secret has slept so long as to raise doubts as to whether the framers of the constitution had in mind in using the term "all other writs," etc., any others than those that were then known, though not mentioned specifically, which were appro-priate to render efficient the jurisdiction conferred. Cer-tainly, as remarked in *State ex rel. Fourth Nat. Bank v. John-son*, 103 Wis. 591, 615, 79 N. W. 1081, those which are men-tioned are sufficient for all ordinary situations, liable to occur where the constitutional authority of superintending control may be called into activity. No event has heretofore occurred, so far as appears from the records of the court, where consti-tutional instrumentalities, without resort to invention, have not been entirely adequate for the supervisory control of in-ferior courts and jurisdictions. What may have appeared some time, as is the case now, to be a need for some new writ or a new function for an old one, originated in misconception of the jurisdiction contemplated by the term "general control

over inferior courts and jurisdictions" as it was understood by the framers of the constitution.

The whole scope of superintending control is, with reasonable accuracy, defined by the quoted words of the constitution. The supplementary grant of authority to issue certain and other specified writs does not enlarge it in any particular. As said in *Att'y Gen. v. Railroad Cos.*, while the use of certain writs was granted to this court in aid of, and for jurisdiction as well, the grant to the circuit courts is an appurtenance to jurisdiction "with power to put the writs to all proper uses;" that is to say: each writ, it was contemplated, should be recognized as having its ordinary function according to the course of the common law, as a mere instrumentality in the exercise of jurisdiction granted independently thereof. It will be observed that the writ of error, the one best known and most commonly used under the old system,—the one appropriate to appellate jurisdiction,—was not mentioned in the grant of authority to circuit courts. It was not appropriate to the jurisdiction of superintending control. The function thereof, as regards the circuit court, was rendered unnecessary by the grant of appellate jurisdiction with legislative power to make the same active in its discretion. It is elsewhere held under a similar statutory system; and the one upon which ours was mainly modeled, that the writ of error cannot be used by a circuit court. That approved would answer the suggestion made by counsel at the bar that jurisdiction in that regard exists as to our circuit courts and should have weight in determining the scope of authority exercisable at the circuit in this case, as to deciding the cause upon the merits. However, there is no need to determine that question here, though it might well be said in passing that the records furnish no precedent for the use of a writ of error by a circuit court.

The exact scope of the jurisdiction denominated "general control over inferior courts and jurisdictions" as to such

courts has never been, so far as we can discover, defined authoritatively. The term or its equivalent may be found in most of the written constitutions of the land. The idea came to us from the judicial system of England. Doubtless in giving to circuit courts an equivalent to the jurisdiction of the English courts of King's Bench, Common Pleas, Exchequer and Chancery, it was designed to construct a system with the three grand divisions, original jurisdiction, appellate jurisdiction, and jurisdiction for supervisory control, the latter being coextensive with the similar jurisdiction formerly exercised by the court of King's Bench. The system for circuit courts is similar, as regards their legitimate field of operation, to that for this court, within its sphere of action, the latter being conferred by the term "general superintending control." That was defined for the first time by this court, speaking through Mr. Justice WINSLOW, in *State ex rel. Fourth Nat. Bank v. Johnson, supra.* As to circuit courts it is fenced about, so to speak, by the functions, in the aggregate, of the ancient writs used to exercise it prior to the constitution, and preserved thereby for the same purpose. It was not given, as such authority was to this court, without instrumentalities essential to its activity, but was given with its appropriate "appurtenances," some being mentioned and others described generally. The scope of the former, as defined by Blackstone (3 Comm. ch. 4, p. 42), referred to as the most reliable source for authority on the question in *State ex rel. Fourth Nat. Bank v. Johnson,* is this: 1. To keep inferior courts within the boundaries of their authority. 2. To coerce the performance of duty where there is no other specific remedy. 3. To interfere for summary and speedy relief when necessary to protect the liberties of the subject. All apply, as will be seen, to matters within the field of jurisdiction. The scope of authority might perhaps be better understood with reference to present conditions if defined thus: 1. To prevent action, usurping jurisdiction, the writ of prohibition being the proper

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

judicial weapon, notwithstanding the legislative attempt to invade the constitutional authority of the court, on the subject, by sec. 3457, Stats. 1898. *State ex rel. Tewalt v. Pollard,* 112 Wis. 232, 87 N. W. 1107. 2. To quicken judicial action in case of unreasonable delay, to set the same in motion in case of refusal to act at all and to compel action within the limits of jurisdiction, in case of inexcusable excursion beyond such limits,—with the writ of *mandamus* as its appropriate "appurtenance." Formerly the writ of *procedendo ad judicium* was also usable in this field. The two performed substantially the same function but came from different courts, the former from that of the King's Bench and the latter from that of Chancery. Since the merger of jurisdictions in one court a single writ suffices for all situations, and the old chancery writ has become practically obsolete. 3. To reverse determinations void for jurisdictional error, the writ of *certiorari* being its proper instrumentality. It has been suggested, and is not now denied, that there may be other writs appropriate to this field of judicial activity. Suffice it to say that Blackstone, to whom all turn for definite information on the subject, does not mention any others, and it is difficult to see why any should be needed. These outlines of the great power of superintending control make the boundaries as definite as they can well be, except by the application of principles to cases as they arise. Experience will demonstrate that where the right is plain superintending control will reach far enough to suit the necessities of the case.

From the foregoing it will be seen that this case comes under the third subdivision of the circuit court's constitutional jurisdiction. The proper writ was sued for and obtained. It could perform its appropriate function and no other. That was limited to removal of the record, as to the matter in hand, into the circuit court for examination as regards jurisdictional error only. The writ has other functions, but none other invocable for the direct purpose of supervisory control. Upon

the certified record, and that alone, the tribunal's decision must stand or fall. The ordinary common-law function of the writ has not been extended in this state. The writ, as the framers of the constitution found it, was given to circuit courts solely in aid of, not for jurisdiction. Therefore, if the functions thereof were extended that would neither add to nor take from the jurisdiction of the court under its mere power of supervisory authority. It would still reach only jurisdictional matters.

Courts elsewhere, in some cases, and some text-writers as well, have said that the function of the writ of *certiorari* has been extended in recent years far beyond its ancient field. Counsel often contend for that view here, as was done in this case, with much persistence, assurance, and disposition to mildly, at least, criticise the court for holding to notions which are "unfitted to modern conditions" as it is said, quite unmindful, it seems, that "such persistent adherence" is only a sturdy maintenance of the plain limitations of the constitution. That this court has spoken often and in no uncertain terms on this question, so that it cannot reasonably be considered an open matter, is evidenced by the following: *State ex rel. Augusta v. Losby,* 115 Wis. 57, 90 N. W. 188; *State ex rel. Vilas v. Wharton,* 117 Wis. 558, 94 N. W. 359; *State ex rel. N. C. Foster L. Co. v. Williams,* 123 Wis. 61, 100 N. W. 1048. A very pressing and futile appeal to this court to accord the writ of *certiorari* a wider scope than that of its common-law function was made in the last case cited, and the court upon due consideration of the matter responded:

"Boards of review up to the dividing line between what is jurisdictional error, error in the exercise of discretion, and judicial error, have ample opportunity to make erroneous decisions from which the aggrieved party has no opportunity for relief. If a remedy should be afforded in such cases the only source from which it can legitimately spring is legislative power. The court cannot give it by changing the scope of the common-law writ of *certiorari,* and has never attempted to."

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

We will now take up the two phases of jurisdictional error which the foregoing suggests in view of the assignments of error, assuming for now that the condemnation in question was incident to the performance of administrative duties. The first matter in order relates to the constitutionality of the law creating the board and defining its authority. Counsel's propositions on that we will take up and treat in their order.

First. "It is not a law, but an enactment attempting to confer upon the board power to make law and pronounce a decision in any particular case without restraint of rule."

That has been to some extent already answered. It is one thing to delegate power to make a law, and quite another to make one and delegate authority to a governmental agency to determine, in cases as they arise, whether the same is applicable thereto, or to administer the law in such cases, determining necessary questions of fact appertaining thereto. The act does not empower the board to prescribe the conditions upon which a person may practice the profession of dentistry; otherwise counsel's contention would have merit. The legislature prescribed such conditions, creating a board to execute its will, in that regard: to determine as to each candidate the existence or nonexistence of essential requisites, and in case of a favorable decision to award him evidence thereof. All there is which can properly be denominated "law" came from the legislature. The board cannot, without usurpation, do more than to execute the law. Legislation of that sort, in many fields of human endeavor and in relation to many matters, has been sustained and generally without controversy, as the numerous cases cited in this opinion will bear witness. "The true distinction," it is said, is "between the delegation of power to make the law, which necessarily involves discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done. To the latter no valid objection can be made." *Dowling v. Lancashire Ins.*

*Co.* 92 Wis. 63, 70, 65 N. W. 738; *Adams v. Beloit,* 105 Wis. 363, 368, 81 N. W. 869.

Second. "It is unconstitutional, as conferring power to decide on reputation and property rights without notice or hearing to the person or corporation whose rights are injuriously affected."

We assume that counsel do not claim that a grant of authority to decide upon the reputability of a college incidental to granting a license to one of its graduates, without notice thereto, would violate any constitutional provision. Certainly no citation referred to so holds, and we do not know of any. Upon principle it would seem none would be essential without legislative requirement. It was never supposed that, in the trial of an action respecting any particular primary matter, it was essential to jurisdiction that a person concerned in an evidentiary matter in respect thereto should be cited or allowed to appear as a party. There is no express grant of authority to the board to determine the status of a dental school by a proceeding *in rem* without notice, so far as we can discover. No legislative purpose to that effect can be read out of the law by reasonable implication, as in *Dietz v. Neenah,* 91 Wis. 422, 64 N. W. 299, 65 N. W. 500. The law confers jurisdiction to determine the matter, making no provision for proceedings to be followed. By necessary implication they must be reasonable. By fair construction that is embodied in the law as unmistakably as if words of the clearest import were used to express it. The court so held, in effect, in *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 88 N. W. 587. That requires procedure in harmony with fundamental principles of justice. Notice to the possessor of the *res,* actual in case of reasonable opportunity therefor, and constructive otherwise, with fair opportunity to appear and be heard, satisfies the essentials of due process of law, that of equal protection of the laws and other constitutional guaranties bearing on the question.

It is said that the statute leaves the reputability of the college absolutely to the judgment of the official board without any remedy for review whatever; that the moment a court undertakes to investigate the matter it will be met by implied prohibition. Not so, as we understand it. The law leaves the matter to the board, acting reasonably, the same as similar matters are commonly left to such agencies exercising *quasi*-judicial authority. It contemplates that the members of the board will proceed with the dignity and fairness commonly expected of tribunals exercising judicial or *quasi*-judicial authority; that they will act as a body; that they will act upon proof of some sort reasonably appropriate to the case and made a matter of record, not necessarily that they will in all cases act regardless of personal investigation, but that in case of reliance thereon the result of the investigation will be made a matter of record; that opportunity will be afforded to the party affected, as to the primary right involved, to know of and to rebut the evidence produced against him if he so desires. In short, that they will exercise their judicial function judicially and that their decisions will be open to review by the courts for jurisdictional error, including that involving the question of whether the basis for the decision indicated by the record constitutes reasonable ground therefor. That was distinctly held in *State ex rel. Coffey v. Chittenden, supra,* in harmony with decisions under similar statutes in this and other courts. Every suggestion on this branch of the case is fully covered in the one cited and in *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964, and others heretofore cited.

Third. "It is unconstitutional in providing that the foregoing powers shall be conferred on a board, a *majority* of whom *shall* be members of a guild or society named, and *all* of whom *may* be selected by the governor from persons recommended by that guild or society."

This giving over, as it is said, of control of the official board

to a private association, largely interested in restricting membership in the profession so that it may determine who shall and who shall not belong thereto, transcends the uttermost limits of police power. Counsel's argument on that point suggests an inviting field for exploration, but we shall forego doing more in that regard now than is necessary to decide the proposition presented and make some general observations showing, as we think, that the danger from the supposed modern trend of legislation to invade private rights, is more imaginary than real in view of constitutional limitations.

It is not without warrant, in view of expressions sometimes found in the books, that the claim is made as regards some features of such regulations as the one we have here, that there is a dangerous tendency, without any constitutional check thereon, under the guise of police power to invade, if not supersede, some of the most cherished principles supposed to be firmly intrenched in the constitution. However, it is not believed but what the vigilant, independent, and courageous judiciary contemplated by the constitution, will prove amply sufficient to prevent any such calamity. One need not grow pessimistic in face of the numerous and peculiar legislative regulations of personal liberty, which seem to be thought expedient by the law-making power. The known necessity of charter restraints to prevent the people in their sovereign capacity from turning upon themselves in their individual capacities to the injury or destruction of natural rights, gave rise to written constitutions as the most significant weapon to guard against it, with an independent branch of the government, the judiciary, to wield that weapon. So long as it properly performs its functions in defense of those fundamental rights of "life, liberty, and the pursuit of happiness," legislative power cannot efficiently violate them.

The police power, with necessary limitations upon it, was contemplated by the framers of the constitution. Such limitations, and means of defining and of making them effective,

were amply provided for.   How any one could have thought
to the contrary, or considerately written for the guidance of
others, or as grounds for judicial action anything inconsistent
therewith, after *Marbury v. Madison,* 1 Cranch, 137, is not
perceived.   The police power may be extended disastrously,
or restrained and administered beneficially, according as the
judiciary shall fully perform its constitutional function.
Confined within its legitimate field as to subjects, and to its
function of mere regulation, it is essential for the full accom-
plishment of the purposes of civil government.   It is com-
monly said that it extends to and permits legislation "regu-
lating" reasonably "all matters appertaining to the life, limbs,
health, comfort, good morals, peace and safety of society;" in
short, to all which promotes the public welfare.   *Baker v.
State,* 54 Wis. 368, 372, 12 N. W. 12; *State ex rel. Larkin
v. Ryan,* 70 Wis. 676, 681, 36 N. W. 823; *State v. Heine-
mann,* 80 Wis. 253, 49 N. W. 818; *Bittenhaus v. Johnston,*
92 Wis. 588, 66 N. W. 805; *State ex rel. Kellogg v. Currens,*
111 Wis. 431, 87 N. W. 561.

The significant word "reasonable," as above used, is not
often found in defining police power.   It should never be
omitted in defining the constitutional scope thereof.   The
legislature has no unlimited authority in this field.   Its scope
has a complete encirclement of constitutional limitations, with
the judiciary to stand guard at the boundary.   The idea that
it is "a sovereign power in the state, to be exercised by the
legislature, which is outside, and in a sense above, the con-
stitution" (*Donnelly v. Decker,* 58 Wis. 461, 17 N. W. 389),
or that a police regulation which is clearly a violation of ex-
press constitutional inhibition is legitimate, subject to a judi-
cial test as to reasonableness, in other words that there is such
a thing as a legitimate, reasonable violation of an express con-
stitutional prohibition (*People v. Jackson & Mich. P. R. Co.*
9 Mich. 285; Tiedeman, State and Federal Control, § 3), or
that no police regulation, not condemned by some express con-

stitutional prohibition, is illegitimate, or that legislation not so condemned is legitimate if the law-making power so wills, though it plainly violates some fundamental principles of justice, or that the reasonableness of a police regulation, and whether it unjustly deprives the citizen of natural rights, is wholly of legislative concern (*Hedderich v. State,* 101 Ind. 564, 1 N. E. 47), and others of a similar character now and then found in legal opinions and text-books, are highly misleading.  They are attributable to failure to appreciate the far-reaching purpose of the general constitutional declarations, the necessity contemplated by the constitution makers of a broad rather than strict construction of those general terms necessarily adopted in drafting such a charter, and the feature making the court the supreme judge as to the extent of limitations.  If it were true that all police regulations are legitimate which are reasonable, and all are reasonable which the legislature so wills, the constitution as to very much of the field of civil government would be of no use whatever.

The idea that the general declared purposes of the constitution were incorporated therein as mere embellishments; that they are only meaningless "glittering generalities," "high-sounding phrases," "signifying nothing" in particular, was condemned, it seems, sufficiently for all time in *Marbury v. Madison, supra.*  This court has spoken decisively in respect thereto.  In *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 42, 91 N. W. 115, 118, it was said:

"The police power has been wittily defined as the power to pass unconstitutional laws, and some utterances of courts have seemed to justify such conception.  It is nevertheless erroneous.  An act which the constitution clearly prohibits is beyond the power of the legislature, however proper it might be as a police regulation but for such prohibition."

Repeatedly it has been said here, that the declared purposes of the constitution are among the most valuable restraints upon legislative authority, and should be given all the force

which they were intended to have. *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 90 N. W. 1098; *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 435, 87 N. W. 561.

So legislation referring to police authority for legitimacy, like any other exercise of the law-making power, must bear the test of constitutional limitations, which will be found upon all sides. On the one side it may meet the barrier of an express prohibition; on another the implied prohibition of any law not in harmony with the all-prevailing purposes of the constitution; on another the implied inhibition involved in the declaration that "the blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles" (sec. 22, art. I, Const.), and at last the limitation of reasonableness springing from the whole constitutional scheme. At that point, as before indicated, the judiciary holds the scales. The legislature is the sole judge of what is expedient, but the judiciary is the judge as to what is beyond the boundaries of reasonable regulation and in the domain of destruction, reasonable doubts in all cases being sufficient to sustain the former. Here is found the last, and intended to be impregnable, line of defense against abuse of police power. It has been well said that without it constitutional guaranties would be of no value. *Marbury v. Madison,* 1 Cranch, 137; *State v. Namias,* 49 La. Ann. 618, 21 South. 852; *State v. Vandersluis,* 42 Minn. 129, 43 N. W. 789; 22 Am. & Eng. Ency. of Law (2d ed.) 936.

Now with full appreciation, it is thought, of the way the law squares itself with reference to the foregoing, it seems that the court would not be justified in holding the same to be utterly unreasonable, or that without reasonable doubt its ostensible purpose to promote the public welfare is a mere cloak to shield a real purpose to promote the interests of members of a voluntary association of professional gentlemen. That the proper training of candidates for the dental profession, the

522      SUPREME COURT OF WISCONSIN.      [Mar.

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

exclusion therefrom of incompetents, and the protection of the public against incapables being allowed to occupy an attitude rendering them liable by false pretenses to gain an opportunity to do injury, appertains to the public good in a most significant degree, is universally held. Such a law, to be sure, might be administered so as to work mischief. The mainspring of its enactment might be one thing and the ostensible purpose another. It is true, however, that similar laws are in force and have passed the test of constitutionality in at least thirty-eight states of the Union.

`  The feature of the law permitting the voluntary association to dictate in a controlling degree the make-up of the board,— the one particularly pointed out by counsel as fatal,—has been sustained by this and other courts on many occasions. A similar feature is found in most all of a multitude of similar laws upon the various statute books of this country. This court, in *State v. Heinemann,* 80 Wis. 253, 49 N. W. 818, approved a law restricting all appointments to the board to nominees of the voluntary association. The following are other significant instances of approvals of such laws: *Wilkins v. State,* 113 Ind. 514, 16 N. E. 192; *Overshiner v. State,* 156 Ind. 187, 59 N. E. 468; *Ex parte Frazer,* 54 Cal. 94; *Ex parte Gerino,* 143 Cal. 412, 77 Pac. 166; *Ferner v. State,* 151 Ind. 247, 51 N. E. 360. The legislative idea is, doubtless, this: It is of great importance to the dental profession that competent candidates therefor only shall be admitted thereto. Such interest is, at least, second only to that of the public. Distinguished members of the profession are of all men the best equipped to conserve the common good. The profession at large may reasonably be trusted to point out such members. Ordinarily none but such would be permitted to stand for the whole. Therefore the surest means of obtaining men of that class to execute the law is to look to the profession at large for nominations. That, certainly, is not unreasonable.

Fourth. "The law is void, because it denies the right to

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

*study* dentistry to persons not possessing qualifications there mentioned, which requirements cannot be upheld under the police power."

We are unable to see that the law has the effect suggested. For aught that appears therein one can study dentistry regardless of his qualifications to compete for a diploma entitling him to a license without examination. He may even be graduated regardless of his accomplishments. He can, however, not have a license to practice except upon condition of showing requisite qualifications. In case of his *alma mater* being reputable and having all other statutory requisites such qualifications are provable by his certificate of graduation; otherwise they must be shown by examination. No one under the law is required to attend a dental college at all, in order to enter the profession. He may acquire the essential qualifications by serving under any dentist conducting a reputable practice. Ch. 411, Laws of 1893, at sec. 4.

The following citations, in addition to those heretofore given, cover favorably to the appellants all questions raised as to the constitutionality of the law: *Hewitt v. Charier,* 16 Pick. 353; *Ex parte Spinney,* 10 Nev. 323; *State v. Call,* 121 N. C. 643, 28 S. E. 517; *People v. Phippin,* 70 Mich. 6, 37 N. W. 888; *State v. Creditor,* 44 Kan. 565, 24 Pac. 346; *State v. Randolph,* 23 Oreg. 74, 31 Pac. 201; *State v. Knowles,* 90 Md. 646, 45 Atl. 877; *State v. Bair,* 112 Iowa, 466, 84 N. W. 532; *State v. Heath,* 125 Iowa, 585, 101 N. W. 429; *Gosnell v. State,* 52 Ark. 228, 12 S. W. 392; *State ex rel. Granville v. Gregory,* 83 Mo. 123; *Harding v. People,* 10 Colo. 387, 15 Pac. 727; *Williams v. People,* 121 Ill. 84, 11 N. E. 881; *People v. Blue Mountain Joe,* 129 Ill. 370, 21 N. E. 923; *Driscoll v. Comm.* 93 Ky. 393, 20 S. W. 431; *State ex rel. Kellogg v. District Court,* 13 Mont. 370, 34 Pac. 298; *Craig v. Board of Med. Exam.* 12 Mont. 203, 29 Pac. 532; *C. Gee Wo v. State,* 36 Neb. 241, 54 N. W. 513; *Barmore v. State Board,* 21 Oreg. 301, 28 Pac. 8; *People v.*

*Moorman,* 86 Mich. 433, 49 N. W. 263; *State v. Forcier,* 65 N. H. 42, 17 Atl. 577; *People ex rel. Nechamcus v. Warden,* 144 N. Y. 529, 39 N. E. 686; *Smith v. Alabama,* 124 U. S. 465, 8 Sup. Ct. 564; *State v. Gazlay,* 5 Ohio, 14; *Goldthwaite v. Montgomery,* 50 Ala. 486.

We now turn to the official record kept by the board as returned in response to the writ. In any view of the case, upon that and that alone appellants must rely to sustain its jurisdiction upon the merits. Here we must take note of the difference between jurisdictional error as to a court proceeding according to the course of the common law and such error as to a mere tribunal exercising *quasi*-judicial authority. In the former, jurisdiction of the party and subject matter being established, the determination cannot be successfully challenged for such error though the basic questions of fact rest upon insufficient evidence, or have no foundation whatever therein. The judgment in such circumstances may be erroneous but not reversible upon writ of *certiorari* for jurisdictional defect. In the latter, a clear violation of law in reaching a result within the power of the tribunal to reach proceeding properly, is jurisdictional error. In the former, the evidence is not reviewable at all. In the latter, it may be reviewed, but only to the extent of determining whether there is evidence upon which the tribunal could reasonably and honestly have reached the conclusion which it did. The evidence cannot be weighed for the purpose of determining whether the same clearly preponderates against the decision. It may be looked into only to see whether there was competent evidence sufficient, in reason, to incline the mind efficiently to the conclusion reached. In the first a conclusion without any credible evidence to support it, or any evidence at all, is mere judicial error. In the second, want of credible evidence which, in case of the verdict of a jury, would be sufficient upon appeal to require a reversal is jurisdictional error: error committed outside of jurisdiction instead of in the exercise of jurisdiction, where the writ takes

hold, performing its function of returning the tribunal to its· proper sphere of action. *State ex rel. Durner v. Huegin*, 110 Wis. 189, 237, 85 N. W. 1046; *State ex rel. Heller v. Lawler*, 103 Wis. 460, 79 N. W. 777; *State ex rel. Augusta v. Losby*, 115 Wis. 57, 90 N. W. 188.

In examining the evidence we may well start with the decision of the board June 15, 1903, establishing the reputability of the college. In all reason that should have put all' questions respecting the matter at rest, subject only to something coming to the attention of the board fairly calling for a new investigation. It would be intolerable for a college after· having its status deliberately established, especially in a direct proceeding, to be compelled from time to time thereafter,. regardless of any change of conditions, to submit to a new in-· vestigation, or for its patrons to be so compelled. That was· definitely proclaimed in *State ex rel. Coffey v. Chittenden*,. 112 Wis. 569, 88 N. W. 587. However, since the action referred to was accompanied by a censure for violating rule 23 prohibiting the admission of students for less than the advertised fees, it will be assumed that the proceedings in the whole were in the nature of such a condonation of past offenses that subsequent transgressions, if there were any, furnished some· justification for considering the same and the past and for-· given offenses as well.

Commencing at the beginning and tracing the history down· to the issuance of the writ, in brief, we find these circumstances relied upon by appellants:

(1) June 8, 1903, the board in effect held the college for· suspension as to reputability unless the negative appeared satisfactorily as to the following: Is it guilty—

(a) Of having violated rule 23 prohibiting the acceptance· or retention of students at less than the advertised fees ?

(b) Of having matriculated students without the certificates of the official examiner as to sufficiency of entrance qualifications ?

(c) Of having unjustly and intentionally aspersed the character of the official examiner as to fitness and honesty as a public servant?

(d) Of having unreasonably failed to confront the official examiner before the board as to charges made against him?

(2) The college permitted six students who failed in the entrance qualifications for the session of 1902–1903 to be matriculated, nevertheless, and continue in attendance making up their deficiencies during the year, contrary to the board's rule on the subject.

(3) The college catalogued the six students for the session of 1903–1904 as "juniors," counting the year partly spent in preparatory studies as satisfying the first year of the course, contrary to the board's command in respect to the matter. ·

(4) The college elected to submit to the decision of the court,—unless ordered to the contrary by the board,—requiring it to give the six students full credit for the year partly spent in the work of preparation, contingent upon whether such action would be regarded by the board as rendering it not reputable.

Aside from the foregoing the college was regarded as reputable, the judgment of the board in that regard having been certified September 15, 1902. It and its graduates were in all reason entitled to rely thereon till the occurrence of something inconsistent therewith. Once established, the status of reputability would be presumed to continue until reasonably rebutted. Time would have no effect thereon except to weaken the presumption, if even that.

The determination of June 15, 1903, settled in favor of the college the alleged misconduct in respect to matters mentioned in No. 1 other than that respecting violation of rule 23. There were then in the institution six students who matriculated for 1902–1903, though failing in some respects in entrance qualifications, and spent the full year in study, partly, however, in making up deficiencies.

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

At the time of the adjudication the board had on its files a communication from the college requesting the status of the six students as to competency for the second year's study of a three years' course to be determined, and that they might be accorded an examination as to entrance qualifications prior to the commencement of such year, and, if found satisfactory, that they might have credit for having taken one full year's study of such three years' course. The grounds for the request were these: Up to the commencement of the session of 1902–1903 the board permitted entrance qualifications to some extent to be made up during the first year of the course. Negotiations with students leading up to their admission were conducted upon that basis without knowledge, until shortly before the commencement of the session, that the custom in that regard had been abrogated. The students who failed had, under the circumstancês, some moral claim on the college which it endeavored to dischárge by making them special in the freshman year and entering them in the academic department as well, and requiring them to spend three hours in study each day in respect to the subjects wherein they were deficient. The request was not responded to. The institution on a previous occasion,—January 29, 1903,—earnestly requested the board to define the status of the six students, which was replied to, in effect, that the matter would be considered upon the board being put in motion "in the usual way to act upon the character and management of your school." The only reference to this matter found in the board's disposition of the subjects investigated as aforesaid is contained in a companion resolution to the one of censure. . The two may well be restated at this point.

"*Resolved,* That the Wisconsin State Board of Dental Examiners, after careful investigation, find that the *Milwaukee Medical College,* Dental Department, has violated sec. 23 of the rules and regulations of said board, relating to the admission of students for less than the advertised fees. It is the sense of the majority of this board that the offense is not

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

of sufficient gravity to warrant the withholding of licenses on diplomas issued to the class of 1903, and therefore the secretary is hereby instructed to issue licenses on application to members of said class according to law.

"*And further resolved,* That the *Milwaukee Medical College,* Dental Department, is hereby censured for its conduct in this matter, and we therefore give the college fair warning that any further violation of the rules of this board will not be tolerated and all rules of the board will be strictly enforced."

That left the college in some doubt as to how the infraction of rule 23 was disposed of. The past was at least excused, but how about the future? The specific request that the students might have credit for one full year of a three years' course was not responded to. Both the college and the students were left in suspense in regard thereto except as they might imagine the attitude of the board from the second resolution. The college was held reputable, notwithstanding its sin in respect to the matter, but it was not determined clearly that it would be consistent with reputability for it to graduate the six students after two more years of study. The resolution was suggestive to the contrary. The students, however, were catalogued for the session of 1903–1904 as "juniors." The board having changed the reputable standard for graduation from a three years' to a four years' course, the new order of things to commence with the session of 1903–1904, it will be seen that if the matriculation of the six students for the previous session was to be deemed regular they were in the former class, otherwise in the latter.

Soon after the commencement of the session of 1903–1904 the board, through its president, successfully sought advice from the National Association of Dental Faculties as to whether the six students should be regarded as having taken one year of a three years' course contingent upon their showing proper entrance qualifications to commence the study of dentistry, or in such contingency to be regarded as having

taken one full year of a four years' course. A controversy, however, soon arose as to the nature of such advice. Appellants insisted that it was to the effect that the students should show proper entrance qualifications and take three years more of successful study, while Dr. Gray, one of the active members of such association, who participated in the matter, insisted that only two years more of study should be required, the young men to be regarded, upon showing proper entrance qualifications, to have taken one year of a three years' course. The controversy was settled in favor of the former theory, Dr. Gray however insisting, "My opinion is that the young men should be permitted to go on and graduate in two more years. I think it is outrageous upon these boys that they are not permitted to do this. However, if it is against the law I will submit."

About the time of the initiation of the transaction last related, the official examiner reported four of the six students to have presented to him teachers' second grade certificates apparently showing proper entrance qualifications. January 23d thereafter,—by a resolution, in general terms, but which was given peculiar significance as to the conduct of respondent respecting its having catalogued the six students as three-year students, by its being sent by special direction thereto,—colleges were admonished that no such institution would be recognized as reputable in which students were allowed to continue in attendance upon any conditions other than those required of regular matriculants whose credentials were duly approved, and who had in all respects complied with the requirements of the published rules and regulations of the board regarding the conduct and reputability of colleges desiring recognition of their diplomas.

Notwithstanding such admonition, respondent permitted the students to continue through the junior course, and catalogued them for the session of 1904–1905 as "seniors," thus indicating defiance of the board's ruling that they should be

permitted to graduate, if at all, only in the class of 1906. As the time approached for the coming out of the class of 1905, the attitude of the board was that of threatening respondent with condemnation if it permitted the six students to graduate as members of that class, and the attitude of respondent was that of endeavoring to avoid giving cause, voluntarily, therefor. In that situation one of the students commenced a *mandamus* action to compel the respondent to recognize him as possessing the requisite standing for graduation with the class of 1905, setting forth most of the facts herein detailed appertaining thereto. Respondent submitted, without objection, to the matter being thus brought before the court for adjudication, giving appellant full opportunity to maintain, in the former's name, its own position in respect to the matter. The tender was declined. Respondent, in its own behalf, made return to the first writ, setting forth all facts in regard to the controversy not already appearing in the proceedings. Such action was thereafter had in respect to the matter that a decision was rendered in favor of the student June 22, 1905, a peremptory writ being ordered.

The result of the *mandamus* action was in due time brought to the attention of the board. Thereupon it held a meeting and adopted, seemingly without time for consideration or effort in that regard, a resolution condemning respondent as not reputable, but subsequently the same was reconsidered and further action in respect thereto was postponed, as the record states, "to obtain further information on the subject."

The subject referred to in the foregoing was that of whether respondent purposed submitting to the decision of the court without further contesting the matter. That is evidenced by the fact that on the day after the proceedings the board caused inquiry to be made of respondent as to whether it "had taken or contemplated taking any steps to graduate the six students." Reply was made thereto the next day, to the effect that no such steps had been taken or were contemplated and that respond-

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis.. 468.

ent would not issue to the students diplomas except under compulsion, that the action to test the matter had been defended in good faith, and that in any event appellants should have the fullest opportunity in respondent's name to further defend. Response was made thereto on the same day demanding to know what steps respondent intended to take, if any, to avoid the court's decision. To that answer was made the following day that respondent would be obliged to defer to the court's order "unless you now order us in writing not to issue such diploma, or else give us a notice in writing that in the event of our issuing such diploma you will declare our college not reputable. In that case we shall not issue the diploma. We are much perplexed, and would like an answer today." That seemingly humble submission did not secure an answer in advance of the act complained of. The next day the board reconvened. The correspondence mentioned, together with information of the issuance of the peremptory writ, was before it. The resolution theretofore laid over, "to gain further information on the subject," was, as it appears, promptly taken up and the final act sought to be reviewed occurred by unanimous vote. The modest request of respondent as aforesaid was thus answered without previous notice that such a calamity to it was impending. On the contrary, it had every reason to believe its attitude of submission contingent on receiving positive information of appellants' requirements, would at least prevent any hasty action, and probably any action whatever, in advance of due notice to it and opportunity to be heard.

So, in brief, the transgressions of respondent for which the sentence of nonreputability was pronounced were three in number, namely: (1) Violation of rule 23 prohibiting concessions to students from advertised fees; (2) violation of the rule prohibiting colleges from accepting students with permission to make up deficiencies in entrance qualifications the first year of their course; (3) violation of the board's order that the

six students should be denied credit for the year partly spent in making up entrance qualifications. Did such transgressions furnish any reasonable basis for the condemnation complained of?

The question suggested must be tested having regard to the meaning of the word "reputable" as used in the law under consideration, and whether in view thereof the standard set by the board can be regarded as reasonable. As said in *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 88 N. W. 187, the board in respect to such matters has a wide discretion. It would require a strong case against it to warrant condemnation for abuse of authority, yet there is a limitation beyond which it cannot go. That limit is the boundary between that which is substantial and therefore reasonable, and that which is purely arbitrary or trifling and therefore unreasonable. The board's action cannot properly be condemned because some or even most persons cannot discover any reasonable ground therefor. To warrant that it must be so violative of reason as to evince a total absence of that fair judgment which should distinguish action of a judicial nature: in short, as to seem baseless when tested by reason and common sense.

The meaning of the word "reputable," as used by the legislature in the instance in question, has not been judicially defined with that exactness which it seems the importance thereof demands. In *State ex rel. Coffey v. Chittenden,* the definition found in an early edition of Webster's Unabridged Dictionary was quoted and given first place, namely, "worthy of repute or distinction; held in esteem; honorable; praiseworthy." Second place was given to the phrasing found in the Century Dictionary, namely, "being in good repute; held in esteem; consistent with good taste." The Illinois court, in *State Board v. People ex rel. Cooper,* 123 Ill. 227, 13 N. E. 201, adopted the first definition. It will readily be observed that in some respects it is erroneous, while in the whole it has a double meaning. It is erroneous in that it fails to suggest

whether it is requisite that the repute or distinction must be good or bad; there is a double meaning in that the first part of the definition, when corrected, would signify a condition of being entitled to a good reputation; while the second part suggests the existence of good repute or reputation in fact. The one relates to actual character; the other to supposed character according to common understanding. As it has been said, one relates to the internal and the other to the external, the former being the substance and the latter the shadow. *In re Spenser*, 7 Cent. Law J. 84, 85.

In our discussion in the former case it was said that "the law does not attempt to define reputability but uses the term in its ordinary sense." It is used "to convey its common meaning, the meaning generally ascribed thereto in everyday ordinary expression calling for its use." What that common, ordinary meaning is as between worthy of good repute and good repute in fact, was not said expressly, but the grounds considered and upon which the board acted, and which were challenged for insufficiency, appertained to true worth, not reputation therefor. Therefore, it is now considered by the court, that it was then held, the legislature used the term reputable, as indicative of worthy of good repute; and that since the legislature shortly after that decision was made, and presumably with regard thereto, amended the law into the form in which we now find it, and which guided the board at the time of the transactions in question, it is too late to reconsider the matter. For the court it is desired to make this as emphatic as may be, and to that end reference is again made to the fact that the primary signification of the words "worthy of repute or distinction" as found in the early edition of Webster, regarded as meaning worthy of good repute or distinction, was in the former case given first place, and that the discussion in detail of the facts proceeded to a conclusion in the light thereof. However, for myself, I reserve the privilege of dissenting on this point.

Now what is there so very wrong about conceding to students some deduction from advertised fees, as seems to have been done, by the respondent, that it should be regarded as suggesting nonreputability. No light is shed on that question by counsel for appellants. If there is any reasonable basis for the board's rule 23, or its rule 36, fixing the minimum charge to students at $100 per term, which seems to be inseparable from the former rule, we are unable to discover it. Reputability has reference to those things which go to the proper preparation of candidates for the dental profession. We venture to say that, all other things being equal, the institution that takes worthy young men, making concessions in their favor to meet their financial needs, thereby assisting them to attain the object of their ambition, is no less worthy of good repute than one which holds to an arbitrary schedule in that regard, tending to exclude much of the very best material for the profession therefrom. Without any extended discussion, it is considered that rule 23, and other rules upon which it is based, are highly unreasonable.

The system of legislative control under consideration was not designed to enable a licensing board to interfere with the mere business management of dental colleges by making laws regarding their charges for instruction, and their treatment of students in respect to their schedule of fees. The power conferred was limited to reasonable protection of the public against danger of incompetent practitioners securing patronage, and is wholly of an administrative character. If the legislature were to go further than to conserve the public welfare, its action in that regard would be destructive, not regulative, of rights and so would be outside of constitutional authority. What interest is it to the people whether a dental college maintains its fees up to a published standard or not, or what particular sum it demands of students as a consideration for the advantages it affords to them. None whatever, as

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

it seems. The board went entirely outside of its legitimate sphere of action in respect to those matters.

The second ground of the board's action has as little to justify it as the first. We search the law in vain for anything in its letter or spirit justifying the board in taking charge of the subject of passing upon entrance qualifications through its representatives, and making submission to such interference with the business of the college a condition of reputability. There seems to be as little support for the board's third ground of action; its prohibition to the making up, to any extent, of entrance qualifications during the first year of a student's course, and making submission to that regulation a condition of reputability. As well might the board assume authority to regulate any one of many mere administrative features of dental colleges, such as the ordinary examinations during the course, or the particular persons to be employed as instructors, or the test to be applied as to their capability, or the particular person to apply such test, or the compensation to be paid to members of the instructional force.

The law requires, not as a condition of reputability of a college, but as a condition of the board's issuing to its graduates licenses upon the faith of their diplomas alone, preliminary education, as to matriculants, equivalent to that for entrance to the junior class of an accredited high school. By necessary implication, the language of the law leaves the college unhampered as regards the examination in respect to that requirement. By necessary implication as well, it clothes the board with ample authority to determine as occasion may require, whether such duty has been performed in good faith. The board in this matter, as well as in fixing minimum charges and prohibiting variations from advertised fees, invaded the functions of the legislature, if such power exists at all. In the particular case the interference was peculiarly oppressive in that it was not brought to the attention of the respondent

until too late for compliance therewith for the session of 1902–1903 without embarrassment to itself and great injustice to its patrons.

The arbitrary character of the board's action is further evinced by the fact that the standard of admission at the time it was created was wholly of the board's invention. The statute, prior to 1903, did not contain any regulation on the subject. In the amended act of that year a feature was added to the existing law in accordance with the rules which the board had theretofore prescribed for the government of colleges, no authority, however, being given to the board, expressly or by implication, to take charge of that branch of the colleges' business.

The statutory requirement as to entrance qualifications must be presumed to have been enacted with reference to the common practice of educational institutions as to allowing, in a reasonable degree, deficiencies in entrance qualifications to be made up during the early part of the school course, and contemplated a continuance of that custom. Any other construction of the law would render it such an oppressive and unreasonable interference with the ordinary business of schools as to require its rejection as absurd if not its condemnation as unconstitutional. The language requiring "a preliminary education equivalent to," etc., is not wholly inconsistent with liberty to allow such education, in some reasonable degree, to be made up within a reasonable time after commencement of the course. Some unmistakable prohibition would be required in order to indicate a legislative purpose to abrogate the custom in that regard which has prevailed generally throughout the country. Entrance qualifications are required for admission to the courses of study universally, in reputable institutions of learning. The regulations in that regard are as universally published for the benefit of all whom it may concern, and yet, commonly, they are regarded as satisfied, though the student falls somewhat below the required

State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468.

standard as to some mattters not very essential, if he makes up the deficiency within a brief period after his matriculation.

The last ground of the board's action has been, perhaps, sufficiently condemned without further discussion. It was a very natural climax to the misconception of authority evinced by the adoption of the arbitrary rules before mentioned. Mere assumed authority, if not checked, will ultimately run wild, as it did somewhat in this case, in condemning respondent as not reputable because of its determination to obey the judgment of the circuit court without further contesting the matter, unless seasonably notified that such a course would lead to its being condemned as not reputable. Nothing said herein should be construed as casting any reflection whatever upon the motives of the gentlemen composing the board, or their advisers. They doubtless, in the best of good faith, acted throughout according to their honest judgment respecting the power vested in them by the law. The fact that they were seriously mistaken only emphasizes the common saying that men, however distinguished and conscientious, are nevertheless liable to make great mistakes.

The foregoing disapproval of the board's action is emphasized by the fact that the law regards reputability to be something separate and distinct from other requirements essential to the graduation certificate of a college constituting an efficient basis for a license to practice the profession of dentistry. It requires: (1) That the college shall be duly incorporated; (2) that the entrance qualifications shall be as indicated; (3) that the period of study shall include seven months in each of four years; (4) and that the college shall be reputable. It may have all of the specific requirements except the last, and be infirm in respect thereto. Again it may have the last essential and not the rest, since the former has reference to general equipment to accomplish in fact good work and send out graduates for the profession of dentistry fully trained therefor, so that the public may safely trust them. There

might be the equipment and such result, entitling the institution not only to be called reputable, but to special distinction, and it might actually achieve such distinction, and yet not have some of the other statutory essentials to the admission of its graduates into the profession without examination. The mere failure to comply with the statute, *a fortiori* with the regulations made by the board with respect to its internal affairs, would not justify sentencing the college, as in this case. Reputability has no reference whatever to mere submission to rules of the state official board or any other board. It has reference, as before indicated, to the actual facilities it possesses for good work as regards preparing candidates for the dental profession, and the actual use of such facilities so as to accomplish good work.

What has been said exhausts the subject of whether the board, assuming that it had jurisdiction of the subject matter of the reputability of respondent, incidental to the determination of the rights of waiting applicants for licenses, exceeded its authority by passing judgment without any reasonable basis therefor, answering the question in the affirmative.

Turning to the situation presented, assuming the character of the proceeding as being directly against the college to adjudicate its status, the sole party on the one side being the respondent, the result is the same, since, as we have seen, no notice was given to it with opportunity to be heard, no reason existed for neglect in that regard, and the proceeding to a finality in face of such neglect was not due process of law. So, in any way we can view the record, the board committed jurisdictional error fatal to its action, warranting the judgment appealed from. In one aspect the error was excess of jurisdiction; in the other, it was total want of jurisdiction.

*By the Court.*—The judgment is affirmed.

Dodge, J., dissents.